**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2U, INC.,<br>7900 Harkins Road<br>Lanham, MD 20706; and<br><br>GET EDUCATED INTERNATIONAL<br>PROPRIETARY LTD.<br>358 Victoria Road<br>Salt River, Cape Town 7925<br>South Africa<br><br>        Plaintiffs,<br><br>  v.<br><br>MIGUEL CARDONA, Secretary of Education<br>400 Maryland Avenue, SW<br>Washington, DC 20202; and<br><br>U.S. DEPARTMENT OF EDUCATION<br>400 Maryland Avenue, SW<br>Washington, DC 20202<br><br>        Defendants. | Case No. 1:23-cv-00925 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs 2U, Inc. (2U) and Get Educated International Proprietary Ltd. (Get Educated) bring this suit against Defendants Miguel Cardona, in his official capacity as Secretary of Education, and the U.S. Department of Education, and state as follows:

**PRELIMINARY STATEMENT**

1.    This suit challenges the Department of Education's brand-new assertion of sweeping regulatory authority over tens of thousands of entities providing key services to institutions of higher education across the United States.  The Department's claim has no footing in the Higher Education Act (HEA), and it marks a complete reversal of the Department's own

1

settled interpretation of the relevant statutory provisions, as set forth in longstanding regulations and guidance documents.  The Department's unprecedented claim of authority—effectuated in a mere Dear Colleague Letter—is contrary to law and arbitrary and capricious, and it ignores the procedural rulemaking requirements set forth in the HEA and Administrative Procedure Act (APA).  This unlawful agency action should now be set aside.

2.      Title IV of the HEA establishes federal student financial-aid programs (e.g., federal grants, loans, and work-study programs) and governs the ways in which institutions of higher education and their students participate in those programs.  By extension, the HEA likewise regulates "third-party servicers" that enter into contracts with such institutions to operate their Title IV financial-aid programs.  The HEA and the Department's longstanding regulations carefully define "third-party servicers" to encompass only entities that contract with institutions of higher education to "administer," through "manual or automated processing," their Title IV aid programs.  20 U.S.C. § 1088(c)(1).  To safeguard federal funds, the HEA places extensive requirements on institutions and third-party servicers governing their management of Title IV loan and grant programs.

3.      For decades, the Department has interpreted the HEA's statutory definition of third-party servicers to refer only to entities that themselves administer Title IV financial-aid programs.  The Department's implementing regulation identifies eleven third-party servicer activities, each of which involves administering such programs:  for example, "[p]rocessing student financial aid applications," "[d]etermining student eligibility," "[p]rocessing output documents for payment to students," "[p]reparing and certifying requests for advance or reimbursement funding," and "[l]oan servicing and collection."  34 C.F.R. § 668.2.  Meanwhile, administrative tasks unrelated to financial aid, such as "[w]arehousing of records" and

"[p]roviding computer services or software," are excluded from the Department's definition of third-party servicers.  *Id.*  As recently as 2017, the Department stated explicitly in its regulatory guidance that "marketing [an] institution's academic programs" is "a non-Title IV function . . . which does not make that entity or individual a third-party servicer."  Updated Third-Party Servicer Questions and Answers, Federal Student Aid, U.S. Dep't of Educ. at 10 (Mar. 8, 2017), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2017-03-08/updated-third-party-servicer-questions-and-answers (2017 Q&A) (click on Attachments: Third-Party Servicer Questions and Answers).

4.      On February 15, 2023, the Department issued a Dear Colleague Letter (corrected on February 16, 2023, and updated on February 28, 2023) providing mandatory guidance to institutions of higher education on how they should arrange their contractual relationships with "third party servicers."  *See (GEN-23-03) Requirements and Responsibilities for Third-Party Servicers and Institutions*, Federal Student Aid, U.S. Dep't of Educ. (updated Feb. 28, 2023), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2023-02-15/requirements-and-responsibilities-third-party-servicers-and-institutions-updated-feb-28-2023 (2023 DCL).  This guidance radically redefines what a third-party servicer is.

5.      The 2023 DCL goes far beyond the statutory definition of "third-party servicer" by covering any entity that performs "functions or services necessary . . . [t]o provide Title IV-eligible educational programs," regardless of whether those functions or services actually trigger the HEA's definitional requirement that such servicers "administer [the institution's Title IV financial-aid programs] through either manual or automated processing."  The DCL further makes clear that under its new definition, third-party servicer status can be triggered by providing generalized recruiting, marketing, software, and curricular development activities that have no

connection to the administration of an institution's financial-aid programs.  Indeed, the DCL's new definition is so broad that it would seem to encompass nearly any entity with a contract to provide services to a Title IV-eligible institution, regardless of whether the entity has any role in managing, disbursing, or processing Title IV financial-aid program funds.

6.     By broadening the definition of third-party servicer, the 2023 DCL imposes an expansive and onerous regulatory regime on companies that facilitate online educational programming and related services for brick-and-mortar colleges and universities but have no role in administering federal financial aid.  Under the Department's regulations, an entity's status as a third-party servicer imposes various reporting and auditing requirements and heightened fiduciary duties, and makes the entity jointly and severally liable to the Department for institutional Title IV regulatory infractions.  The Department also claims the right to order third-party servicers immediately to cease providing services to any institution of higher education in certain circumstances.  And the 2023 DCL asserts that neither third-party servicers nor their subcontractors may be located outside the United States or owned by foreigners.

7.     The Department lacks unilateral authority to rewrite the HEA's definition of a third-party servicer.  Nor can it impose legal obligations on regulated entities without following the procedural rulemaking requirements of the HEA and APA.  Yet that is exactly what the Department is trying to do:  The 2023 DCL orders institutions and potential third-party servicers to fully comply with its expanded regulatory mandates by September 1, 2023, under threat of enforcement actions carrying significant consequences.

8.     2U is an online program manager (OPM) that contracts with nonprofit institutions of higher education to help build, deliver, and support their online educational programs.  2U provides its institutional clients with a bundle of technology and services, including learning

4

technology, curriculum design, career support, marketing services, student engagement and support services, faculty support services, enrollment application assistance, student recruitment, and other support services useful for delivering online university programs.  2U does not administer any aspect of any institution's Title IV financial-aid programs, and none of its activities qualify it as a third-party servicer under the HEA.  But 2U would be classified as a third-party servicer under the 2023 DCL's unprecedented redefinition of that term.

9.      This new classification threatens to inflict substantial, irreparable harm on 2U, which will be forced to (among other things) amend contracts with partner institutions, agree to joint-and-several liability with institutions for Title IV program liabilities, and subject itself to burdensome and intrusive audits—all while incurring compliance costs that it cannot recover if it succeeds in its claim.  Furthermore, because of the 2023 DCL's express prohibition on foreign-owned or foreign-based subcontractors, 2U will be forced to cut off Get Educated, its South African subsidiary, from providing a range of services to 2U's institutional partners.

10.     Judicial relief is therefore warranted for at least three reasons.

11.     *First*, the 2023 DCL is contrary to law.  The DCL classifies entities that do not administer Title IV financial-aid programs as "third-party servicers," even though the HEA and the Department's own regulations limit the definition of that term to entities engaged in such administration.  20 U.S.C. § 1088(c).  Without even the pretense of statutory authority, the DCL also completely bars institutions from contracting with any third-party servicer that is foreign-owned or foreign-based, or that uses subcontractors that are foreign-owned or foreign-based.  The DCL is incompatible with the HCA, and its massive disruption of American higher education violates the major questions doctrine.

12.     *Second*, the 2023 DCL is arbitrary and capricious.  The DCL abandons prior

longstanding regulations and guidance reserving third-party servicer status to entities involved in the administration of Title IV financial-aid programs, without properly acknowledging the change in position, providing a rationale for that change, or explaining why the change makes sense as a matter of law or policy.  The DCL's newly expansive definition of third-party servicer is arbitrary and has no clear connection to the purposes of Title IV's regulatory regime.

13.     *Third*, the 2023 DCL violates the HEA and APA's procedural requirements.  The Department failed to follow the HEA's required negotiated rulemaking process and the APA's notice-and-comment requirements for the promulgation of new legislative rules.  The DCL's September 1, 2023 effective date violates the HEA's master calendar requirements, which do not allow disruptive regulatory changes to be implemented on such an accelerated timetable.

14.     Plaintiffs therefore pray that the Court (1) declare unlawful and set aside the 2023 DCL as arbitrary, capricious, and not in accordance with the law; and (2) grant a stay of the 2023 DCL's effective date or a preliminary injunction, and eventually a permanent injunction, prohibiting the Department from treating Plaintiffs as third-party servicers under the terms of the 2023 DCL.

## PARTIES

15.     Plaintiff 2U, Inc. is an OPM that partners with public and private non-profit institutions of higher education to help build, deliver, and support their online educational programming.  2U is a Delaware corporation with its principal place of business at 7900 Harkins Road, Lanham, MD 20706.  2U offers its services in this District and nationwide.

16.     Plaintiff Get Educated International Proprietary Ltd. is a wholly owned subsidiary and subcontractor of 2U that provides support for online educational programming at public and private non-profit institutions of higher education in the United States, the United Kingdom, and South Africa.  Get Educated is a South Africa proprietary company with its

principal place of business at 358 Victoria Road, Salt River, Cape Town 7925, South Africa.

17.     Defendant Miguel Cardona is the Secretary of Education.     In this capacity, Secretary Cardona has ultimate responsibility for activities at the Department, including the actions complained of herein.   His governmental activities occur in this District and nationwide.

18.     Defendant U.S. Department of Education is an executive department of the United States.    Its headquarters and principal place of business are at 400 Maryland Avenue, SW, Washington, DC 20202.   Its governmental activities occur in this District and nationwide.

## JURISDICTION, EXHAUSTION, AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This action arises under the APA, which waives sovereign immunity against the United States, 5 U.S.C. §§ 701-706. Plaintiffs' prayers for declaratory judgment and preliminary and permanent injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. § 1361.

20.     The 2023 DCL is a final agency action subject to review under the APA.  *See* 5 U.S.C. § 704.  It reflects the consummation of the Department's decisional process, includes an express effective date of September 1, 2023, and conclusively rescinds prior guidance issued by the Department.  Moreover, its terms are mandatory in nature, establishing new requirements for regulated parties and potential penalties for failure to comply with those requirements.  The Department has made clear that regulated entities treated as third-party servicers under the 2023 DCL's new definition must immediately take steps to bring themselves into compliance with the new definition by September 1, 2023.

21.     Immediate judicial review is warranted:  Plaintiffs face significant and irreparable harm from the Department's action; and Plaintiffs have no other adequate remedy.

22.     Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one

Defendant is an officer or agency of the United States and resides in this District.

## BACKGROUND

### A.      2U, Get Educated, and Their Operations

23.      2U is an OPM that builds, delivers, and supports online-educational programming for over 230 colleges, universities, and corporations.

24.      Its college and university partners consist of public and private non-profit institutions, including the University of California at Berkeley, Harvard University, Howard University, MIT, Morehouse College, the University of Pennsylvania, the University of Texas at Austin, and Yale University.  2U has provided access to online education offerings to tens of millions of learners.

25.      2U provides its institutional clients with a bundled package of technology and services that include learning technology, learning design, career support, marketing services, student engagement and support technology, enrollment application assistance, student recruitment, and other support services necessary for the online delivery of educational programs.

26.      Institutional independence and university oversight is at the foundation of 2U's partnerships.  Institutions maintain full control over tuition pricing, accreditation, curriculum, admissions standards and acceptance decisions, graduation requirements, faculty hiring decisions, student instruction, program size, and financial-aid decisions and administration.  They also approve all marketing assets and collateral.  2U is not involved in administering its partner institutions' participation in Title IV financial-aid programs, and it does not engage in financial-aid counseling.

27.      In exchange for 2U's services, 2U receives a share of the tuition revenue received by the institutions from students in 2U-supported programs.

28.      To provide some of its services to its partner institutions, 2U often enters contracts

with other companies, including some that are or may be located abroad.  2U has an extensive presence in South Africa, where its wholly owned subsidiary Get Educated provides student recruiting and curriculum development services.  2U acquired Get Educated in 2017 for $103 million.  Get Educated is not involved in administering Title IV financial-aid programs for any institution.

29.    2U also contracts with other subcontractors to provide various services to its partner institutions.  Some of those services are provided through foreign employees.

30.    Students enrolled in 2U-supported educational programs often meet or exceed their campus-based counterparts in retention and graduation rates.  According to 2021 numbers, 2U-supported degree programs have a 90% retention rate and a 73% graduation rate.  *2021 Transparency Report* 13, 2U, https://ddfoqzqsu0zvp.cloudfront.net/media/documents/ 2021_Transparency_Report.pdf (last visited Apr. 4, 2023).

31.    2U's partnerships with educational institutions are memorialized in long-term Master Services Agreements typically lasting longer than ten years.  These contracts set forth each party's rights and responsibilities and the terms and conditions with respect to the educational program(s) that 2U supports for the institution.  For example, these contracts specify: (1) the services that 2U will provide; (2) the university's obligations with respect to the educational program (e.g., create the program curriculum, determine admissions standards and make admissions decisions, set tuition prices, provide faculty, etc.); (3) how the university will compensate 2U for its services; (4) the length of the contract term, the parties' termination rights, and the effect of termination; and (5) the parties' respective intellectual property rights, including applicable licenses to use the other party's intellectual property in connection with the educational program.

32.     Importantly, the contracts make clear that the university at all times exercises complete control over tuition prices, curricular content, teaching, awarding credits and degrees, administering financial aid, grading, admission standards and admissions decisions, and all other core academic functions that support an institution's degree programs.  The contracts also include detailed risk-allocation provisions regarding indemnification, limitation on direct damages, and disclaimers of indirect damages.  2U does not receive separate payment for the provision of student recruitment services, and 2U does not compensate its employees based on success in securing individual student enrollments.

33.     For each degree program that 2U enables, 2U makes a significant up-front investment (oftentimes up to $5 million), and recoups that investment through revenue sharing with the partner institution as students progress through the program, ultimately earning a degree. As a result, the contracts: (1) do not contain termination-for-convenience provisions; (2) are terminable for breach only if the breach is not cured within a set period of time; and (3) contain transition provisions detailing how students are to be taught through the remainder of their program and the program transitioned in an orderly fashion in the event of the termination or expiration of a contract.

34.     2U operates and provides its services as a third party, unaffiliated with its partner institutions.

35.     2U's contracts with its university partners are complex and long-term.  As a result, negotiations are oftentimes protracted—on average, taking more than nine months—and involve multiple internal and external parties on both sides (for example, financial representatives, legal representatives, university operations, university faculty, university leadership, technology support, and cybersecurity personnel).

B.       **The HEA Definition of "Third-Party Servicers"**

36.       Title IV of the HEA was originally enacted in 1965 and amended in relevant part in 1992.  It provides a variety of federal financial assistance programs for students pursuing higher education.  *See generally* Pub. L. No. 89-329, 79 Stat. 1219 (1965); Pub. L. No. 102-325, 106 Stat. 448 (1992).  Various provisions of the HEA establish grant and loan programs to provide assistance to students who need financial support.  *See, e.g.*, 20 U.S.C. § 1070a (Federal Pell Grants); *id.* §§ 1070b to 1070b-4 (Federal Supplemental Educational Opportunity Grants); *id.* §§ 1087a-1087j (Federal Direct Loans).

37.       Since 1992, the HEA has authorized institutions of higher education to employ third-party servicers to help institutions administer Title IV financial-aid programs in various ways, including by assessing student eligibility for Title IV funds, disbursing funds, and servicing and collecting student loans.  *See* 20 U.S.C. § 1088(c); 34 C.F.R. § 668.2.

38.       The HEA defines third-party servicers in relation to the specific work they perform—namely, administration of an institution's Title IV financial-aid programs.  The statute defines a "third party servicer" as "any individual, any State, or any private, for-profit or nonprofit organization, which enters into a contract with . . . any eligible institution of higher education to administer, through either manual or automated processing, any aspect of such institution's student assistance programs [under Title IV]."  20 U.S.C. § 1088(c)(1).

39.       The HEA also classifies as third-party servicers lenders or guaranty agencies that "administer, through either manual or automated processing, any aspect of such guaranty agency's or lender's student loan programs" for a Title IV loan program, "including originating, guaranteeing, monitoring, processing, servicing, or collecting loans."  20 U.S.C. § 1088(c)(2).

40.       Under the HEA, third-party servicers are subject to an annual "compliance audit," which must be conducted by an independent auditor and submitted to the Department.  *Id.*

§ 1094(c)(1)(C)(i). Institutions must report their relationships with third-party servicers to the Department. *Id.* § 1099c(b)(3)(A). And institutions may not contract with a third-party servicer if the servicer has been "terminated" for matters "involving the acquisition, use, or expenditure of [Title IV] funds" or has been "judicially determined to have committed fraud involving [Title IV] funds." *Id.* § 1094(a)(16)(A).

41. The HEA authorizes the Department to promulgate "regulations applicable to third party servicers (including regulations concerning financial responsibility standards for, and the assessment of liabilities for program violations against, such servicers) to establish minimum standards with respect to sound management and accountability of programs" involving certain campus-based aid. *Id.* § 1082(a)(1). It requires the Secretary to "prescribe standardized forms and procedures regarding" "origination of loans," "electronic funds transfer," "guaranty of loans," and other related issues "by regulation developed in consultation with . . . third party servicers and other organizations involved in providing loans under this part." *Id.* § 1082(*l*)(1).

42. The HEA also specifically authorizes the Department to "prescribe such regulations as may be necessary for" the compliance audit and for the "limitation, suspension, or termination of the eligibility of a third party servicer to contract with any institution" as well "an emergency action against a third party servicer." *Id.* § 1094(c)(1)(C), (H), (I). The Department has exercised this regulatory authority to provide that a "third-party servicer may not enter into a written contract with an institution" if, among other things, the "servicer has been cited during the preceding five years for failure to submit audit reports . . . in a timely fashion." 34 C.F.R. § 668.25(d)(1)(iii).

## C. The Department's Historic Understanding of Third-Party Servicers

43. Because Congress enacted a statutory definition carefully calibrated to encompass only entities involved with the administration of Title IV financial aid on behalf of institutions,

the Department's regulations regarding third-party servicers do not claim to reach service providers who do not participate in administering the institution's Title IV financial-aid programs or disbursement of funds.

44.     The Department's regulations define a "[t]hird-party servicer" as any "individual or a State, or a private, profit or nonprofit organization that enters into a contract with an eligible institution to administer, through either manual or automated processing, any aspect of the institution's participation in any Title IV, HEA program."  34 C.F.R. § 668.2.

45.     The Department's regulations elaborate on that definition by providing a specific list of financial-aid related activities that are carried out by third-party servicers:

- "Processing student financial aid applications";

- "Performing need analysis";

- "Determining student eligibility and related activities";

- "Originating loans";

- "Processing output documents for payment to students";

- "Receiving, disbursing, or delivering Title IV, HEA program funds, excluding lock box processing of loan payments and normal bank electronic fund transfers";

- "Conducting activities required by the provisions governing student consumer information services [regarding institutional and financial-assistance disclosures]";

- "Preparing and certifying requests for advance or reimbursement funding";

- "Loan servicing and collection";

- "Preparing and submitting notices and applications required [by relevant

regulations]"; and

- "Preparing a Fiscal Operations Report and Application to Participate (FSIAP)."

38 C.F.R. § 668.2.

46.     Each of these listed activities involves direct administration of an aspect of the institution's participation in Title IV financial-aid programs.  The Department has indicated that the list "provide[s] a baseline to judge other activities that could be deemed an aspect of the administration of an institution's participation in the Title IV, HEA programs."  59 Fed. Reg. 8044, 8045 (Feb. 17, 1994).

47.     The Department's regulation defining "third-party servicer" also recognizes that services not involving the administration of Title IV aid programs do not transform a contractor into a third-party servicer.  In particular, it emphasizes that the provision of "computer services or software" does not qualify as a third-party servicer activity.  34 C.F.R. § 668.2.

48.     Before February 2023, the Department's sub-regulatory guidance documents similarly recognized that the work performed by third-party servicers is limited to activities relating to the administration of an institution's Title IV student-financial-aid programs.

49.     In 2012, the Department issued a Dear Colleague Letter reiterating the terms by which institutions must contract with third-party servicers "to carry out title IV programmatic requirements and activities, particularly activities related to delivering title IV credit balances to students directly or through a contractor-supplied financial institution such as a bank or a credit union."  *GEN-12-08: Disbursing or Delivering Title IV Funds Through a Contractor* 1 (Apr. 26, 2012),  https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN1208.pdf  (2012 DCL).

50.     In 2015, the Department issued another Dear Colleague Letter regarding the type of work performed by third-party servicers.  *See GEN-15-01: Third-Party Servicer Institutional Requirements and Responsibilities* 2 (Jan. 9, 2015), https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN1501.pdf (2015 DCL).   The 2015 DCL generally tracked the Department's longstanding emphasis on activities pertaining to the disbursement or servicing of Title IV financial-aid funds for assessing whether an entity qualifies as a third-party servicer.  *Id.* at 1-2.

51.     In 2016, the Department released another Dear Colleague Letter with an attached "Questions and Answers" document that "provide[d] additional guidance on issues related to third-party servicer requirements."  *GEN-16-15: Third-Party Servicer Questions and Answers* 1 (Aug.   18,   2016),   https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2016-08-18/third-party-servicer-questions-and-answers (2016 DCL).   In a 2017 electronic announcement, the Department revised that document and created the 2017 Q&A.

52.     The 2017 Q&A reiterated the points the Department had made previously, but also provided additional clarification of which activities the Department did—and did not—believe triggered third-party servicer status.  Importantly, the Department explained that "perform[ing] a non-Title IV function, such as marketing the institution's academic programs . . . does not make [an] entity or individual a third-party servicer."  2017 Q&A at 10.

53.     Thus, prior to 2023, the Department had never understood activities unrelated to the administering of Title IV financial-aid programs, such as providing recruiting, marketing, software, or curricular services, to be third-party servicer activities.

**D.     The 2023 DCL's Redefinition of Third-Party Servicer**

54.     On February 15, 2023, the Department issued the 2023 DCL that is the subject of this suit.  A true and correct copy of the 2023 DCL, as updated on February 28, 2023, is attached

to this complaint as Exhibit 1.  A true and correct copy of the original 2023 DCL, issued on

February 15, 2023, is attached to this complaint as Exhibit 2.

55.    The 2023 DCL expressly "rescinded" all of its past guidance as provided in the

2012, 2015, and 2016 DCLs and the 2017 Q&A.  Ex. 1 at 2.

56.    The 2023 DCL radically expands the Department's understanding of the functions

of third-party servicers well beyond the HEA's definition of that term as encompassing entities

that "administer, through either manual or automated processing, any aspect of [an] institution's

[Title IV] student assistance programs."  20 U.S.C. § 1088(c)(1).  For example, the 2023 DCL

expands the definition of "third-party servicer" to cover any entity that performs "functions or

services necessary . . . to provide for Title IV-eligible educational programs," Ex. 1 at 2,

regardless of whether those functions or services actually involve "administer[ing], through either

manual or automated processing," the institution's Title IV assistance programs (as required by

Section 1088(c)(1).  The DCL further makes clear that, under its new definition, third-party

servicer status can be triggered by providing generalized recruiting, marketing, and curricular

development activities that have no connection to an institution's financial-aid programs.  Ex. 1

at 1, 3-4, 6-7.

57.    Among other things, the new DCL captures entities engaged in:

- "[P]erforming the functions of student recruiting and retention, the provision

    of software products and services involving Title IV administration activities,

    and the provision of educational content and instruction."  *Id.* at 1.

- "Interacting with prospective students for the purposes of recruiting or

    securing enrollment.  This includes, but is not limited to, providing prospective

    students with information on educational programs, application and document

requirements, deadlines, and the enrollment process." *Id.* at 3.

- "Preparing and/or disseminating promotional materials to market educational programs if the entity or individual provides any technology, curriculum, or faculty, or is otherwise involved in the design or delivery of educational programs." *Id.* at 4.

- "Monitoring academic engagement and/or daily attendance.  Conducting outreach to students regarding attendance or academic engagement." *Id.* at 6.

- "Establishing requirements for the completion of a course and/or evaluating whether a student has met those requirements; [d]elivering instruction or mandatory tutoring; [a]ssessing student learning, including through electronic means; or [d]eveloping curricula or course materials, unless the institution maintains full control of the curriculum/materials and delivers the instruction itself." *Id.* at 7.

58.     These changes will subject a wide range of entities, including 2U and other education technology companies, to regulation as third-party servicers.  In doing so, it will trigger costly audit requirements and expose these companies to significant risks, such as disqualification from contracts with Title IV institutions of higher education in the event of perceived regulatory infractions, as described further below.

59.     The DCL also imposes obligations on institutions.  It requires institutions to review all their contracts with third-party contractors, determine whether those contractors now qualify as third-party servicers under the Department's expanded definition, and then report those contracts to the Department.

60.     The Department claims that it decided to issue the 2023 DCL based on its review

of "numerous contractual arrangements between institutions and outside entities," which led it to conclude that "most activities and functions performed by outside entities on behalf of an institutions are intrinsically intertwined with the institution's administration of the Title IV programs and thus the entities performing such activities are appropriately subject to TPS requirements." Ex. 1 at 1. As a result, the Department saw the need for an "updated list of functions and activities that fall within the scope of the TPS requirements," specifically focusing on "the functions of student recruiting and retention, the provision of software products and services involving Title IV administration activities, and the provision of educational content and instruction." *Id.*

61.    The 2023 DCL acknowledged that the Department "has not previously notified the community that the performance of these functions subjects an entity to TPS requirements." *Id.*

62.    The initial version of the 2023 DCL stated that it was immediately "[e]ffective as of the date of publication" and "update[d] and replace[d] past guidance," which it "rescinded." Ex. 2 at 1-2. It further instructed that "[i]nstitutions have until May 1, 2023 to report any arrangements with third-party servicers that have not been reported to the Department. Entities or individuals that meet the definition of a TPS as a result of this Dear Colleague Letter are required to submit the Third-Party Servicer Data Form to the Department or update their existing form no later than May 1, 2023." *Id.* at 23. And the original 2023 DCL invited the public "to submit comments regarding the guidance presented in this Dear Colleague Letter within 30 days of the publication of this letter." *Id.*

63.    On February 28, 2023, the Department updated the 2023 DCL. It "recognize[d]" that the 2023 DCL "has created some uncertainty around exactly what requirements and reporting deadlines will apply." Ex. 1 at 16. As a result, the Department "adjust[ed] the effective date of

the guidance to September 1, 2023," and "adjust[ed] the comment period so that it close[d] 30 days from the date of this update." *Id.* at 17.  The Department again invited the public "to submit comments regarding the guidance presented in this Dear Colleague Letter." *Id.*  The Department did not indicate whether or when it would consider and respond to comments.

64.    On March 23, 2023, the Department announced its intention to begin negotiated rulemaking proceedings in the fall of 2023.  *See* Press Release, U.S. Dep't of Educ., The Department of Education Announces Hearings on Higher Education Rulemaking (Mar. 23, 2023), https://www.ed.gov/news/press-releases/department-education-announces-public-hearings-higher-education-rulemaking.  The Department specifically noted that one of the "[p]otential topics" for consideration is "[t]hird-party servicers and related issues" along with other topics related to "distance education." *Id.*

65.    On March 30, 2023, the period for submitting comments on the DCL closed.  In total, over 1,100 individuals or entities offered comments.  These comment letters are available at https://www.regulations.gov/docket/ED-2022-OPE-0103.  2U submitted comments explaining why the 2023 DCL "is unnecessarily broad, exceeds the Department's statutory authority, does not comply with the rulemaking requirements under the HEA or the APA, and does not rely on any relevant data to full inform the proposed changes.  The sheer breadth of the 2023 DCL will not only disrupt the current servicer model, but likely force many servicers and the universities they support out of the market."  2U Comment Letter[1] at 7 (Mar. 30, 2023).

66.    Many other entities also submitted comments in opposition to the 2023 DCL.  For example, the American Council on Education, writing on behalf of eighty-five higher-educational associations, submitted comments "urg[ing] the Department to rescind the current DCL" because

---

[1]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-1074.

of "the harmful consequences that will result from the Department's expansive new definition of a third-party servicer (TPS), without corresponding benefit." ACE Comment Letter[2] at 1 (Mar. 29, 2023). ACE stated that the 2023 DCL "far exceeds" the HEA's statutory authority and offers a definition "so broad or vague as to suggest that virtually every relationship or contract between an institution and an outside entity would make that entity a TPS." *Id.* at 2, 5. ACE also listed a whole host of entities that may be swept in by the 2023 DCL, including hospitals, police departments, study-abroad programs, publishers, and high schools. *Id.* at 3.

67.     Similarly, EDUCAUSE (a leading nonprofit association with the mission of promoting the use of information technology to advance higher education) urged the Department to withdraw the 2023 DCL because its overbroad definition of third-party servicer "has the potential to severely disrupt the content, software, systems, and services provider relationships on which higher education institutions rely." EDUCAUSE Comment Letter[3] at 7 (Mar. 7, 2023). EDUCAUSE emphasized that the 2023 DCL's new definition is "seemingly unbounded," *id.* at 3, and appears to indicate that "virtually every digital content, software, systems, and services provider [that its member institutions] have is now considered a [third-party servicer]," *id.* at 1.

68.     Many educational institutions likewise submitted comments opposing the 2023 DCL. For example, the University of Texas System noted that the 2023 DCL imposes a "significant" "administrative compliance burden" and that "[e]ach University of Texas institution needs more time to conduct an in-depth and individualized review of each contract and relationship with each outside entity to determine whether the DCL's expanded TPS definition applies." UT System Comment Letter[4] at 1 (Mar. 28, 2023). It also observed that "the unintended

---

[2]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0024.

[3]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0024.

[4]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0497.

consequence [of the 2023 DCL] may be to reduce the capacity of minority-serving institutions to meet the needs of the most at-risk students," since "[r]esearch provides ample evidence that services designed to improve student engagement and retention . . . have the greatest impact on degree attainment for the most disadvantaged students." *Id.*

69.     Other educational institutions likewise urged the Department to rescind the DCL or substantially revise it. *See, e.g.*, NYU Comment Letter[5] at 1 (received Mar. 29, 2023) ("The massive expansion of the TPS designation . . . will impose annual costs that will require either raised tuition or reduction of other aspects of our offerings, with no increase in educational value for the students."); University of Dayton Comment Letter[6] at 5 (Mar. 27, 2023) (third-party servicer regulations "will be debilitating to many of the entities that newly find themselves to be a TPS, and they very well may exit the higher education market, leaving universities like UD to find a replacement TPS (likely at a higher cost) or go without the service"); University of Maryland Baltimore County Comment Letter[7] at 1 (Mar. 29, 2023) (noting that the DCL will leave "our study abroad programs . . . severely diminished" and will increase "overall risks to the safety and security of our travelers"); Rhodes College Comment Letter[8] at 4 (Mar. 23, 2023) ("The negative impact of the Guidance as written cannot be overstated."); University of California Comment Letter[9] at 1 (Mar. 30, 2023) ("[W]e are extremely concerned about the expanded scope of the Third-Party Servicers (TPS) definition, the timing of the new requirements, and the significant institutional compliance required in a short amount of time.").

---

[5]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0578.

[6]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0246.

[7]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0633.

[8]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0180.

[9]     Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0944.

70.    Other organizations concerned with diversity, equity, and inclusion expressed their concerns with the 2023 DCL's "devastating effect on efforts to increase access to BIPOC (Black, Indigenous, and People of Color) students in education abroad programming," Diversity Abroad Comment Letter[10] at 2 (Mar. 30, 2023), and noted that its audit requirement "will have a particularly harmful effect on programs serving students who are undocumented," National College Attainment Network Comment Letter[11] at 2 (Mar. 30, 2023).

71.    Even Amazon Web Services, Inc. submitted a comment letter, explaining that its provision of cloud-computing services to institutions for use in storing student information could render it a third-party servicer in the Department's view.  Amazon Comment Letter[12] at 2 (Mar. 29, 2023).  Amazon also expressed concern that the DCL might treat its own provision of educational content, including materials for training and certification programs, as triggering third-party servicer status.  *Id.* at 2-3.

72.    Other interested entities, including the International Education Council,[13] the Society for Human Resource Management,[14] Ellucian Company L.P.,[15] Unizin Ltd.,[16] Duane Morris LLP,[17] the Missouri Hospital Association,[18] Seattle Children's Hospital,[19] the State of

---

[10]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-1094.

[11]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0870.

[12]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0758.

[13]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0304.

[14]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0581.

[15]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0278.

[16]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0171.

[17]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-1089.

[18]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0593.

[19]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0258.

Washington Department of Health's Nursing Care Quality Assurance Commission,[20] Wiley,[21] Coursera,[22] Pearson,[23] McGraw Hill,[24] the Association of American Publishers,[25] and Education Testing Service[26] also submitted comments critical of the 2023 DCL.

73.     The letters cited above are only a small sample of the hundreds of comments filed opposing the 2023 DCL and urging the Department to withdraw or reformulate its unprecedented new interpretation of third-party servicer.

     **E.     Consequences of Classification as a Third-Party Servicer**

74.     Classification as a third-party servicer has significant consequences.  Third-party servicers are subject to stringent and burdensome regulations, and regulatory infractions could be fatal to a contracting entity's relationships with its institutional clients.

75.     From the initiation of the Department's rulemaking following the 1992 HEA amendments, the Department defended the regulations imposed on both institutions and third-party servicers on the grounds that its regulations were meant "to ensure that institutions and third-party servicers administer Title IV, HEA program funds properly."  Student Assistance General Provisions; Federal Family Education Loan Programs; Federal Pell Grant Program, 59 Fed. Reg. 22,348, 22,361 (Apr. 29, 1994).

76.     The Department's regulations impose fiduciary obligations on third-party servicers, requiring them to "at all times act with the competency and integrity necessary to

---

[20]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0650.

[21]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0866.

[22]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0967.

[23]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0966.

[24]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0852.

[25]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0949.

[26]    Available at https://www.regulations.gov/comment/ED-2022-OPE-0103-0880.

qualify as a fiduciary." 34 C.F.R. § 668.82(a).  As a fiduciary, a "third-party servicer is subject to the highest standard of care and diligence in administering any aspect of the programs on behalf of the institutions with which the servicer contracts and in accounting to the Secretary and those institutions for any funds administered by the servicer under those programs." *Id.* § 668.82(b)(2).

77.   As a result, both the HEA and the Department's regulations subject third-party servicers to heightened regulatory requirements and stringent penalties for violations.

78.   The HEA requires the servicer to undergo an annual "compliance audit . . . with regard to any contract with an eligible [educational] institution . . . for administering or servicing any aspect of the student assistance programs." 20 U.S.C. § 1094(c)(1)(C)(i).

79.   The audit must be "conducted by a qualified, independent organization or person in accordance with standards established . . . for the audit of governmental organizations, programs, and functions." *Id.* The results of the audit must then be submitted to the Department. *Id.*

80.   Educational institutions partnered with third-party servicers must report those partnerships to the Department. *Id.* § 1099c(b)(3)(A).

81.   Moreover, the statute forbids institutions from contracting with third-party servicers if that servicer was previously "terminated" for matters "involving the acquisition, use, or expenditure of [Title IV] funds" or was "judicially determined to have committed fraud involving [Title IV] funds." *Id.* § 1094(a)(16)(A).

82.   The Department's regulations also impose various requirements on third-party servicers.

83.   Any contract between an educational institution and a third-party servicer must include certain terms, including that the servicer be "jointly and severally liable [with the

institution] . . . for any violation by the servicer of any statutory provision of or applicable to Title IV of the HEA, any regulatory provision prescribed under that statutory authority, and any applicable special arrangement, agreement, or limitation entered into under the authority of statutes applicable to Title IV of the HEA."  34 C.F.R. § 668.25(c)(3).

84.     The servicer must also agree to refer to the Department "any information indicating there is reasonable cause to believe that the institution might have engaged in fraud or other criminal misconduct" relating to Title IV.  *Id.* § 668.25(c)(2).

85.     The regulations also impose potentially crippling sanctions on third-party servicers for regulatory infractions.  For example, an institution could be forbidden from contracting with a third-party servicer under certain conditions if certain penalties have been imposed within the preceding five years—including citations for failure to submit an audit "in a timely fashion."  *Id.* § 668.25(d).

86.     Under 34 C.F.R. § 668.24(f), a third-party servicer must cooperate with the Department when it conducts "audits, investigations, program reviews, or other reviews authorized by law."  Third-party servicers are also subject to review by the Department's Inspector General.  Among other things, the Inspector General may make record requests of third-party servicers.  *See id.* § 668.23(e).

87.     The 2023 DCL adds another requirement: "To protect the interests of institutions, taxpayers, and students, an institution may not contract with a [third-party servicer] to perform any aspect of the institution's participation in a Title IV program if the servicer (or its subcontractors) is located outside of the United States or is owned or operated by an individual who is not a U.S. citizen or national or a lawful U.S. permanent resident.  This prohibition applies to both foreign and domestic institutions."  Ex. 1 at 2.

**F.    The 2023 DCL's Impact on 2U**

88.    As an OPM, 2U provides a host of services to partner institutions, including services relating to curriculum development, student recruiting, student support services, and marketing services.

89.    2U structured its business specifically not to perform any services related to the administration of Title IV funds, financial-aid counseling, preparation of consumer-information disclosures as defined by 34 C.F.R. §§ 668.41-668.49, or any other activity that would give rise to classification as a third-party servicer under the HEA's definition of third-party servicer, the Department's regulations, or the Department's prior guidance.  Accordingly, neither 2U nor the Department has ever classified 2U as a third-party servicer prior to issuance of the 2023 DCL.

90.    Under the 2023 DCL's expanded definition of third-party servicer, 2U would qualify as a third-party servicer for multiple reasons, including its provision of services relating to curriculum development, student recruiting, student support services, and marketing services.

91.    2U and its partner institutions entered into their contracts on the settled understanding—per the Department's prior guidance and the plain meaning of the definition of third-party servicers in the HEA and promulgated regulations—that the services 2U provides do not render it a third-party servicer.  For example, 2U's standard contracts contain the following language:  "University shall be solely responsible for the administration of all financial aid programs and will process all requests for aid within ten (10) days for 90% of Program Applicants. University shall provide Program Student financial assistance services similar to those it offers to students enrolled in the University's on-campus master's degree programs.  2U shall not be involved in any manner in the award or disbursement of financial assistance provided pursuant to Title IV of the Higher Education Act of 1965, as amended.  University acknowledges that 2U is

not, and shall not be reported by University as, a 'third party servicer' (as defined by federal regulations including 34 C.F.R. §§ 668.2 and 668.25)."

92.     Subjecting 2U to the 2023 DCL threatens to disrupt 2U's business model and its contracts with its partner institutions in various ways.

93.     *First*, 2U now faces the threat that any infraction for noncompliance with regulations governing third-party servicers could lead to crippling sanctions.

94.     For example, the Department could terminate 2U's ability to perform under its contracts, which are now defined as Title IV functions under the more expansive definition of the 2023 DCL.   *See* 34 C.F.R. § 668.86(a)(1)(i) (giving the Department authority to "limit or terminate" for violations of "any regulatory provision prescribed under" the HEA).  Likewise, if the Department believed 2U failed to act "in accordance with the highest standard of care and diligence required of a fiduciary," it could initiate "an emergency action," a "fine," or "the limitation, suspension, or termination of [2U's] eligibility to contract with any institution to administer any aspect of the institution's participation in that program."  34 C.F.R. § 668.82(c)(2).

95.     Even if 2U did not face punitive action from the Department, institutions could be wary of contracting with any third-party servicer accused of violations.  The Department can punish institutions for a third-party servicer's violations.  *See id.* § 668.86(a)(2) ("If the Secretary begins a limitation or termination proceeding against a third-party servicer, the Secretary also may begin a fine, limitation, suspension, or termination proceeding against any institution under whose contract a third-party servicer commits the violation.").  Thus, a single regulatory infraction could dissuade educational institutions from entering into contracts with 2U.

96.     *Second*, the 2023 DCL threatens to impinge on 2U's relationships with its partner institutions because 2U's classification as a third-party servicer will require revision and renegotiation of all of 2U's existing contracts with those institutions.

97.     Among other things, 2U will now have to agree to be "jointly and severally liable . . . for any violation by the servicer of any statutory provision of or applicable to Title IV of the HEA, any regulatory provision prescribed under that statutory authority, and any applicable special arrangement, agreement, or limitation entered into under the authority of statutes applicable to Title IV of the HEA." *Id.* § 668.25(c)(3). The heightened exposure flowing from this joint-and-several liability—as well as from the fiduciary duty imposed on third-party servicers—will also likely necessitate, as a practical matter, significant changes to the contractual relationships between 2U and its partners. Such changes could affect the range of services provided by 2U, the compensation received for those services, and the balance of rights and duties set forth in the contracts.

98.     Moreover, 2U will be responsible for alerting the Department of any suspicion of fraudulent or criminal conduct by an institution relating to the administration of Title IV programs. Thus, 2U will be effectively required to police its partner institutions—even on the institution's handling of student-aid matters in which 2U plays no role—or risk being held responsible for not reporting an institution to the Department.

99.     *Third*, the 2023 DCL will require 2U to review all of its subcontractor relationships and cease any relationship with any contractor located abroad, with employees based abroad, or owned by foreign persons. That is a substantial problem for 2U, which subcontracts for many of its services with Get Educated and other contractors located abroad, and with U.S.-based subcontractors with employees abroad. The DCL's requirement that 2U curtail its business

relationship with these subcontractors could irreparably harm 2U by substantially disrupting 2U's operations.  It would also inflict significant harm on the subcontractors (including Get Educated) and their employees.  2U will also need to review its other relationships to ensure that it is not providing services to partner institutions using subcontractors subject to foreign ownership.

100.  *Fourth*, to avoid the risk of potentially calamitous infractions and ensure that it is compliant with its newly imposed fiduciary-level obligations, 2U will incur significant and ongoing compliance costs.

101.  Among these recurring costs will be regular audits.  The HEA requires the servicer to undergo an annual "compliance audit . . . with regard to any contract with an eligible [educational] institution . . . for administering or servicing any aspect of the student assistance programs." 20 U.S.C. § 1094(c)(1)(C)(i).

102.  2U will also be responsible, among other things, for:

- Submitting a form within 10 days of: changing its business name; changing its address or contact information for any business location; adding or terminating contracts with eligible Title IV institutions; buying, selling, or merging with another third-party servicer; or going out of business.

- Returning any records regarding 2U's participation in the administering of the institution's participation in Title IV programs.

- Implementing information-safety protocols—meant to apply to financial institutions—established by Federal Trade Commission regulations and by statute.

- Complying with the Family Educational Rights and Privacy Act in regard to the receipt and use of educational records.

103.    In addition, in order to avoid being held liable for its institutional partners' representations regarding the programs 2U supports, 2U will now need to spend significant resources independently examining its institutional partners' marketing claims.  *See* 34 C.F.R. § 668.72.

104.    Given the potential regulatory pitfalls, 2U will be pressured to renegotiate contracts and potentially offer fewer services to reduce the chances of making compliance errors that could lead to suspension by the Department or joint and several liability for regulatory violations.

105.    These and other compliance costs will be compounded in the near term given the DCL's September 1, 2023, effective date.

106.    Many costs are already foreseeable:

- Due diligence costs to undertake thorough reviews of institutions' compliance with the Title IV rules.

- Costs of training employees to abide by new requirements.

- Costs to examine and renegotiate contracts with partner institutions.

- Costs of the annual compliance audit and other new ongoing compliance measures.

- Greater insurance costs.

- Costs of replacing subcontractors located abroad who are no longer authorized to assist 2U in providing services to Title IV institutions.

107.    Because 2U cannot recover damages from the Department under the APA, the losses it incurs from undertaking these compliance measures will constitute irreparable harm.

**CLAIM I:  VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY
ACTION NOT IN ACCORDANCE WITH LAW
Violation of 5 U.S.C. § 706(2)(A); 20 U.S.C. § 1088(c)(1)**

108.    The foregoing paragraphs are incorporated by reference as if set forth in full.

109.    The DCL is contrary to the HEA and the Department's regulations because it departs from—and indeed, radically expands—the HEA's specific definition of third-party servicer.  It also has no clear connection to the stated purpose of Title IV's third-party-servicer rules, which is to ensure that institutions and third-party servicers administer Title IV funds properly.  *See* 59 Fed. Reg. at 22,361.

110.    Under the HEA, a "third party servicer" is "any private, for-profit or nonprofit organization" that contracts with "any eligible institution of higher education to administer, through either manual or automated processing, any aspect of such institution's [Title IV] student assistance programs."  20 U.S.C. § 1088(c)(1).

111.    This definition encompasses only third parties that directly participate in the administration of an educational institution's Title IV financial-aid programs; it does not encompass the provision of general services to an institution—such as recruiting, marketing, software, curricular development, and the like—that do not involve directly processing or administering Title IV financial-aid programs.

112.    Additionally, the HEA's reference to administration "through . . . manual or automated processing" indicates that the thing being administered—"any aspect of [an] institution's student assistance programs"—is readily "process[ed]" in an automatic manner, which naturally evokes the various financial-aid documents that must be processed in connection with the provision of Title IV aid to students.  *Id.*

113.    The 2023 DCL now would regulate, in addition to activities related to the administration of Title IV financial-aid programs, all activities leading up to and including delivery of the institution's underlying educational programs.  The 2023 DCL justifies treating entities conducting such activities as third-party servicers because they provide services related to a portion of Title IV-eligible programming at an institution.  Ex. 1 at 1.  But the HEA's definition of third-party servicer forecloses this justification.

114.    The statutory definition is not broad enough for the Department to label entities as third-party servicers simply because they provide services supporting a Title IV institution's educational programs, such as services relating to recruiting, retention, marketing, software, or instructional content.  The HEA's use of the phrase "administer . . . student assistance programs" refers solely to Title IV aid programs, *see* 20 U.S.C. § 1088(c)(1) (referring to "programs under this subchapter": Title IV)—not to the institutions' educational programs more generally.  Under the HEA, an entity that does not administer a Title IV financial-aid program cannot be a third-party servicer.

115.    Several other statutory provisions demonstrate that the phrase "administering . . . student assistance programs" means playing a direct role in administering Title IV student aid. *Id.* § 1094(c)(1)(C)(i).

116.    The definition of third-party servicer itself refers to a "guaranty agency, or any other eligible lender" that "administer[s], through either manual or automated processing, any aspect of such guaranty agency's or lender's student loan programs, . . . including originating, guaranteeing, monitoring, processing, servicing, or collecting loans."  *Id.* § 1088(c)(2).  Here, the link between student-loan servicing and "administ[ration], through either manual or automated processing" is explicit.

117.    Another provision bars third-party servicers from charging applicants a fee for "the collection, processing, or delivery of financial aid" forms.  *Id.* § 1090(a)(6).  Each of these provisions treats third-party servicers as managing aspects of financial-aid programs, not merely being involved with an educational program for which students might use Title IV proceeds.

118.    The HEA also requires institutions to provide the Department with "a description of the third party servicers" with which they contract, and to "maintain a copy of any contract *with a financial aid service provider or loan servicer*."  *Id.* § 1099c(b)(3) (emphasis added).  This reinforces that Congress envisioned third-party servicers as either administering financial aid or acting as loan servicers.

119.    A proper construction of the HEA shows that supplying services unrelated to the administration of financial-aid programs—such as marketing, recruiting, software, and curricular development services—does not make the entity supplying those services a third-party servicer. By treating OPMs as third-party servicers under Section 1088(c)(1), the Department has departed from the third-party servicer scheme established by Congress.

120.    The statute's narrow definition of third-party servicer is confirmed by the Department's longstanding interpretation of that definition.

121.    The governing regulation reiterates the connection between third-party servicers and involvement with administering Title IV financial-aid programs.  *See* 34 C.F.R. § 668.2.

122.    The regulation provides specific categories of work that can qualify an entity as a third-party servicer.  *See supra* ¶ 45.  Each of these categories relates to the provision of financial aid:  that is, processing and determining eligibility for aid, or providing counseling and assistance to aid applicants.  *See id.*  The Department has indicated that this list of activities "provide[s] a

33

baseline to judge other activities that could be deemed an aspect of the administration of an institution's participation in the Title IV, HEA programs."  59 Fed. Reg. at 8045.

123.    Meanwhile, the Department's regulation specifically excludes administrative and professional-service activities, such as performing audits, data entry, and "[p]roviding computer services or software."  34 C.F.R. § 668.2.

124.    The 2012 and 2015 DCLs likewise largely focus on the technicalities of becoming a third-party servicer and properly managing Title IV aid programs and requirements.  Nothing in these DCLs suggests that the activities performed by OPMs would make OPMs third-party servicers.

125.    Moreover, the Department's 2017 Q&A guidance expressly states that "marketing the institution's academic programs . . . does not make [an] entity or individual [providing that service] a third-party servicer."  2017 Q&A at 10.

126.    In short, the Department has sought to twist a statutory provision designed to regulate entities responsible for administering financial-aid programs into a sweeping regulatory scheme governing virtually any third-party contractor that provides any services to institutions of higher education.  That effort is flatly inconsistent with the text, history, and purpose of the HEA and is conflict with longstanding regulatory definitions of "third-party servicer."

127.    Apart from the flaws noted above, the Department has offered no statutory or regulatory basis for its wholly novel prohibition on any institutional contracts with a third-party servicer if that "servicer (or its subcontractors) is located outside of the United States or is owned or operated by an individual who is not a U.S. citizen or national or a lawful U.S. permanent resident."  The HEA does not remotely provide the Department with the authority to promulgate this sweeping ban on foreign third-party servicers.

128.    Taken as a whole, the 2023 DCL threatens to transform the relationship between the Department, institutions of higher education, and their outside contractors without any clear authorization from Congress.  By expanding the category of third-party servicers to encompass virtually any outside entity providing services to an institution of higher education, it expands the Department's authority over American higher education; disrupts longstanding contractual relationships between institutions and their contractors; exposes tens of thousands of newly-designated third-party servicers to new fiduciary duties, joint-and-several liability, and audit requirements; and forbids foreign entities from providing services to U.S. institutions of higher education.

129.    That result violates not only the HEA, but also the major questions doctrine, which requires agencies to "point to 'clear congressional authorization'" when claiming "'extravagant statutory power'" or the authority to "make a 'radical or fundamental change' to a statutory scheme."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citations omitted).  The Department has no such clear authorization here; indeed, the Department lacks even a "plausible textual basis" for its action.  *Id.*

130.    Here, the Department "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'"  *Id.* at 2610 (second alteration in original) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  But Congress "'could not'" and did not intend "'to delegate' such a sweeping and consequential authority" in a narrow and carefully circumscribed definitional provision.  *Id.* at 2608 (citation omitted).  The 2023 DCL is yet another manifestation of a "recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *Id.* at 2609; *see also, e.g.*, *Nebraska v. Biden*, 52 F.4th 1044 (8th

Cir. 2022) (per curiam).  The major questions doctrine confirms that the 2023 DCL is unlawful and cannot stand.

### CLAIM II:  VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ARBITRARY AND CAPRICIOUS AGENCY ACTION Violation of 5 U.S.C. § 706(2)(A)

131.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

132.    The DCL is also unlawful because it is arbitrary and capricious.

133.    Agency action may be set aside as arbitrary and capricious under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

134.    An agency's failure to "at a minimum acknowledge [a] change [in position] and offer a reasoned explanation for it" is also arbitrary and capricious.  *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

135.    The 2023 DCL fails to fully acknowledge the Department's change of position, and it offers no reasoned justification for that change.

136.    Prior to the 2023 DCL, the Department treated "third-party servicer" as a statutory term referring to financial-aid service providers and loan servicers.  As explained above, *see* ¶ 45, the Department's regulatory definition of "third-party servicer" includes a list of eleven categories of activities that such servicers may engage in.  Each of those categories relates to the provision of financial aid:  that is, processing and determining eligibility for aid, or providing counseling or assistance to aid applicants.  *See* 34 C.F.R. § 668.2.

137.    Meanwhile, the Department's regulation specifically excludes administrative and professional-service activities such as performing audits, data entry, and "[p]roviding computer services or software." *Id.*

138.    The 2012 and 2015 DCLs adhered to this narrow understanding of third-party servicer, focusing primarily on the technicalities of becoming a third-party servicer and properly managing Title IV aid programs and requirements. *See supra* ¶¶ 49–50.

139.    But now, any entity that performs "functions or services necessary . . . [t]o provide Title IV-eligible educational programs" counts as a third-party servicer, regardless of whether those functions or services actually involve administration of the institution's Title IV assistance programs. Ex. 1 at 2.

140.    The Department's 2017 Q&A guidance expressly said that "marketing the institution's academic programs . . . does not make [an] entity or individual [providing that service] a third-party servicer." 2017 Q&A at 10.

141.    Now, however, the DCL says that "[p]reparing and/or disseminating promotional materials to market educational programs if the entity or individual provides any technology, curriculum, or faculty, or is otherwise involved in the design or delivery of educational programs" all qualify an entity as a third-party servicer. *See* Ex. 1 at 4.

142.    The 2017 Q&A guidance also instructed that a software provider would be treated as a third-party servicer only if it was using the software "for the determination of Title IV eligibility." 2017 Q&A at 9.

143.    Now, "the provision of software products and services involving Title IV administration activities, and the provision of educational content and instruction" qualifies an entity as a third-party servicer. *See* Ex. 1 at 1.

144.    Previously, with respect to an entity's outreach to potential students, only assisting with financial-aid applications or giving financial-aid counseling made the entity a third-party servicer.  2015 DCL 1-2.

145.    Now, an entity's interaction with prospective students for recruiting purposes makes that entity a third-party servicer.  *See* Ex. 1 at 3.

146.    Entities like 2U and their partner institutions built business models and entered contractual relationships in reliance on the Department's longstanding view of third-party servicers.  So have countless other institutions, outside service providers, and other entities.

147.    Those reliance interests have now been upset by the 2023 DCL—which did not acknowledge or purport to consider such reliance interests.

148.    The absence of any acknowledgment of—or explanation for—these changes is reason enough for setting aside the DCL.  Indeed, it does not appear that the Department gave any consideration to the sweeping implications of the DCL's new definition.

149.    It is likewise arbitrary for the Department to extend the definition of third-party servicer to capture any service provided to institutions, given the HEA's exclusive focus on Title IV aid programs.  There is no reasonable justification for subjecting entities that contract with institutions of higher education to provide curricular content, recruiting services, software, and admissions services—but who are not involved in any aspect of the institution's Title IV financial-aid programs—to the onerous regulatory regime governing third-party servicers.  Nor is there any reasonable justification for barring third-party servicers from using subcontractors located abroad or owned by foreigners to help deliver services to the partner institutions.

150.    For the foregoing reasons, the Department's vastly expanded definition of third-party servicer is arbitrary, capricious, and an abuse of discretion.

## CLAIM III:  VIOLATION OF THE HIGHER EDUCATION ACT AND ADMINISTRATIVE PROCEDURE ACT FOR FAILURE TO FOLLOW PROCEDURAL RULEMAKING REQUIREMENTS
### Violation of 5 U.S.C. §§ 553, 706(2)(D); 20 U.S.C. §§ 1089, 1098a

151.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

152.    The 2023 DCL seeks to create a legislative rule without undergoing the rulemaking procedures set forth in the HEA and APA.

153.    The HEA requires the Department to engage in "negotiated rulemaking" as a predicate to issuing a legislative rule.  *See* 20 U.S.C. § 1098a(b).

154.    Per the HEA, the Department "shall obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs . . . , such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." *Id.* § 1098a(a)(1).

155.    The Department must then "take into account the information received through such mechanisms in the development of proposed regulations and shall publish a summary of such information in the Federal Register together with such proposed regulations." *Id.* § 1098a(a)(2).

156.    The negotiated-rulemaking process is mandatory unless the Department determines and publishes in the Federal Register that such rulemaking "is impracticable, unnecessary, or contrary to the public interest." *Id.* § 1098a(b)(2).  No such finding was made here.

157.     Unlike other DCLs issued by the Department, which merely state the Department's interpretation of governing statutes or regulations, the 2023 DCL purports to impose new obligations on regulated parties.

158.     The DCL reads like a regulation, rather than guidance—it says with specificity what actions do and do not make an entity subject to classification as a third-party servicer.

159.     And most importantly, it backs its new demarcations up with threats of enforcement.

160.     The 2023 DCL states that the Department's review of contracts involving OPMs "made clear that the Department must conduct oversight of the entities performing these functions to ensure compliance with the [third-party servicer] requirements."  It then directs institutions to begin reporting their relationships with OPMs by an effective date of September 1, 2023.  It likewise instructs OPMs to begin undergoing the annual audit required of third-party servicers.

161.     The Department itself even appears to recognize that it is engaged in rulemaking.

162.     The DCL includes an effective date of September 1, 2023, on which its measures will take effect and institutions' reports on their relationships with third-party servicers will be due.  Ex. 1 at 17.

163.     The Department does not have discretion to dispense with the HEA's negotiated-rulemaking process absent good cause.  *See Bauer v. DeVos*, 325 F. Supp. 3d 74, 96-97 (D.D.C. 2018) (holding that the strictures of the APA apply to the HEA's negotiated rulemaking provision).

164.     Nothing in the DCL suggests that exigent circumstances justify immediate issuance of a new rule.  *See id.* at 97-99.

165.    The Department also violated the APA's independent obligation to engage in notice-and-comment rulemaking before promulgating a legislative rule.  *See* 5 U.S.C. § 553.

166.    The Department did not publish notice of its effort to reformulate its prior understanding of third-party servicers in the Federal Register.  *See id.* § 553(b).

167.    The Department did not provide a meaningful opportunity to comment before finalizing the 2023 DCL.  *See id.* § 553(c).

168.    As to timing, the HEA requires the Secretary to comply with the master calendar requirements, which provide that "any regulatory changes initiated by the Secretary affecting [Title IV] programs," if published after November 1 of a given year, "shall not become effective until the beginning of the second award year after such November 1 date," i.e., until July 1 of the second year after the current year.  20 U.S.C. § 1089(c)(1).  For example, if a regulation is published on November 15, 2023, it cannot become effective until July 1, 2025 at the earliest.

169.    Congress enacted the master calendar requirement to ensure that institutions have sufficient notice of the timing of any regulatory change in order to implement regulatory changes at the start of each award year.  *See* 82 Fed. Reg. 49,114, 49,116 (Oct. 24, 2017).

170.    The 2023 DCL is a "regulatory change" affecting Title IV programs subject to the HEA's master calendar requirements.

171.    The 2023 DCL violates the HEA's master calendar requirements and attempts to make a regulatory change effective in the middle of an award year.  Under the HEA, in order to set an effective date of September 1, 2023 for the 2023 DCL, the Department would need to have promulgated the 2023 DCL on or before November 1, 2022.  *See* 20 U.S.C. § 1089(c)(1); *cf. id.* § 1088(a)(1) (defining award year).  Under the plain terms of the HEA, because the 2023 DCL

was "not . . . published in final form by November 1 prior to the start of the award year," it "shall not become effective until" July 1, 2024.

172.    For the foregoing reasons, the Department's effort to rewrite the definition of third-party servicer violates the HEA and APA procedural rulemaking requirements.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray this Court enter judgment in their favor and grant the following relief:

1.    A declaration as follows:

    a.    The 2023 DCL is contrary to the HEA and APA, namely 20 U.S.C. § 1088(c)(1) and 5 U.S.C. § 706(2)(A), because it is inconsistent with the statute's narrow definition of third-party servicer and violates the major questions doctrine.

    b.    The 2023 DCL violates the APA, namely 5 U.S.C. § 706(2)(A), because its expansion of the definition of third-party servicer to cover entities not engaged in managing Title IV financial-aid funds was arbitrary, capricious, and an abuse of discretion.

    c.    The 2023 DCL is contrary to the HEA and APA, namely, both 20 U.S.C. § 1098a and 5 U.S.C. §§ 553, 706(2)(D), because it imposes a legislative redefinition of third-party servicers without having undergone either the prescribed negotiated-rulemaking process or notice-and-comment proceedings, and because it violates the HEA's master calendar requirements, 20 U.S.C. § 1089(c)(1).

2.      Orders staying the effective date of the 2023 DCL, and/or preliminarily enjoining the Department from enforcing the 2023 DCL pending adjudication of this case on the merits.

3.      Orders preliminarily and permanently enjoining the Department from requiring Plaintiffs to be treated as third-party servicers per the terms of the 2023 DCL.

4.      An order awarding Plaintiffs their costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

5.      Such other and further relief as the Court deems just and proper.

Dated: April 4, 2023                                      Respectfully submitted,

                                                         /s/ *Roman Martinez*
                                                         Roman Martinez
                                                         DC Bar No. 1001100
                                                         roman.martinez@lw.com
                                                         Andrew D. Prins
                                                         andrew.prins@lw.com
                                                         D.C. Bar No. 998490
                                                         Charles S. Dameron
                                                         DC Bar No. 1048053
                                                         charles.dameron@lw.com
                                                         William J. Seidleck
                                                         DC Bar No. 1602107
                                                         william.seidleck@lw.com
                                                         LATHAM & WATKINS LLP
                                                         555 Eleventh Street, NW, Suite 1000
                                                         Washington, DC 20004
                                                         Tel: (202) 637-2200
                                                         Fax: (202) 637-2201

                                                         *Attorneys for Plaintiffs*