**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| 2U, INC., and GET EDUCATED INTERNATIONAL PROPRIETARY LTD.,<br><br><br>       Plaintiffs,<br><br>   v.<br><br>MIGUEL CARDONA, Secretary of Education, and U.S. DEPARTMENT OF EDUCATION,<br><br><br>     Defendants. | Case No. 1:23-cv-00925<br><br>Oral Argument Requested |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY**
**AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 4

    A.    The Higher Education Act .............................................................. 4

    B.    The Department's Historic Understanding Of Third-Party Servicer ........... 6

    C.    The 2023 DCL's Redefinition Of Third-Party Servicer ............................. 7

    D.    Plaintiffs' Businesses .................................................................. 10

ARGUMENT ............................................................................................... 12

I.    PLAINTIFFS WILL SUCCEED ON THE MERITS ............................................ 13

    A.    The 2023 DCL's Third-Party Servicer Definition Is Contrary To Law .................................................................................... 13

        1.    The HEA's Definition Of Third-Party Servicer Covers Only Entities That Administer Financial-Aid Programs ............. 14

        2.    The Department Has Long Understood That Third-Party Servicers Must Administer Financial-Aid Programs ................... 17

        3.    The 2023 DCL's Third-Party Servicer Definition Violates The HEA, The Department's Own Regulations, And The Major Questions Doctrine ........................................... 22

    B.    The 2023 DCL Is Arbitrary And Capricious ...................................... 27

    C.    The Department Unlawfully Failed To Proceed Through Negotiated Rulemaking In Redefining "Third-Party Servicer" ................ 30

II.    PLAINTIFFS FACE IRREPARABLE HARM ABSENT IMMEDIATE RELIEF .................................................................................... 33

    A.    2U's Direct Compliance Obligations Will Inflict Irreparable Harm ........ 33

    B.    The 2023 DCL Requires 2U To Revise And Renegotiate Its Contracts With Its Partner Educational Institutions .............................. 34

    C.    The 2023 DCL Irreparably Harms 2U's Relationship With Get Educated .................................................................................. 38

i

III.   THE EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE
       RELIEF ......................................................................................................................40

CONCLUSION..................................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alabama Association of Realtors v. Department of Health & Human Services*,
141 S. Ct. 2485 (2021) ................................................................................................34

*American Association of Cosmetology Schools v. DeVos*,
258 F. Supp. 3d 50 (D.D.C. 2017) ..............................................................................31

*American Bar Association v. United States Department of Education*,
370 F. Supp. 3d 1 (D.D.C. 2019) ................................................................................29

*American Trucking Associations v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ....................................................................................40

*\*American Wild Horse Preservation Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ...............................................................................27, 29

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) ..............................................................................30

*Beacon Associates, Inc. v. Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018) ............................................................................39

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....................................................................................................34

*Brenntag International Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) ........................................................................................39

*\*Carlson v. Postal Regulatory Commission*,
938 F.3d 337 (D.C. Cir. 2019) ...............................................................................22, 27

*CSX Transportation, Inc. v. Williams*,
406 F.3d 667 (D.C. Cir. 2005) ....................................................................................38

*Department of Homeland Security v. Regents of the University of California*,
140 S. Ct. 1891 (2020) ................................................................................................29

*Eco Tour Adventures, Inc. v. Zinke*,
249 F. Supp. 3d 360 (D.D.C. 2017) ............................................................................38

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................................................................................................29

Page(s)

*Feinerman v. Berardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................38

*\*FTC v. Qualcomm Inc.*,
    935 F.3d 752 (9th Cir. 2019) ....................................................................34, 38, 39

*General Electric Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ...................................................................30

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...................................................................41

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................40, 41

*Luokong Technology Corp. v. Department of Defense*,
    538 F. Supp. 3d 174 (D.D.C. 2021) ...................................................................39

*Nalco Co. v. EPA*,
    786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................................34, 39

*Nebraska v. Biden*,
    52 F.4th 1044 (8th Cir. 2022) ...................................................................27

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................12, 40

*Pennsylvania v. DeVos*,
    480 F. Supp. 3d 47 (D.D.C. 2020) ...................................................................12

*TikTok Inc. v. Trump*,
    490 F. Supp. 3d 73 (D.D.C. 2020) ...................................................................39

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ...................................................................38

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ...................................................................25

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ...................................................................41

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ...................................................................25, 27

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ...................................................................12

Page(s)

## STATUTES AND REGULATIONS

5 U.S.C. § 553................................................................................31

5 U.S.C. § 553(b)............................................................................32

5 U.S.C. § 702..........................................................................13, 34

5 U.S.C. § 705................................................................................12

5 U.S.C. § 706(2)...........................................................................27

5 U.S.C. § 706(2)(A).......................................................................13

5 U.S.C. § 706(2)(C).......................................................................13

20 U.S.C. § 1070a.............................................................................4

20 U.S.C. § 1070a(f)(1)....................................................................14

20 U.S.C. §§ 1070b to 1070b-4..........................................................4

20 U.S.C. §§ 1087a-1087j...................................................................4

20 U.S.C. § 1088(a)(1).....................................................................32

20 U.S.C. § 1088(c)......................................................................4, 14

20 U.S.C. § 1088(c)(1)........................................1, 5, 14, 17, 22, 23

20 U.S.C. § 1088(c)(2)..................................................................5, 14

20 U.S.C. § 1089.............................................................................32

20 U.S.C. § 1089(c)(1)....................................................................32

20 U.S.C. § 1090(a)(6)....................................................................16

20 U.S.C. § 1094(a)(16)(A)..........................................................5, 15

20 U.S.C. § 1094(c)(1)(C)(i)....................................................5, 15, 33

20 U.S.C. § 1094a(a)(1)...................................................................14

20 U.S.C. § 1098a(a)(1)...................................................................31

20 U.S.C. § 1098a(a)(2)...............................................................31, 32

v

**Page(s)**

20 U.S.C. § 1098a(a)-(b)(1) ....................................................................................31

20 U.S.C. § 1098a(b)(1) .........................................................................................31

20 U.S.C. § 1099c(b)(3) ..........................................................................................15

20 U.S.C. § 1099c(b)(3)(A) ..................................................................................5, 34

20 U.S.C. § 3403(b) ................................................................................................16

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ...............................................................4

Pub. L. No. 102-325, 106 Stat. 448 (1992) ..............................................................4

34 C.F.R. § 668.2 ...............................................................................4, 6, 7, 19, 23, 28

34 C.F.R. § 668.2(b) ...............................................................................................18

34 C.F.R. § 668.23(a)(3) ......................................................................................5, 33

34 C.F.R. § 668.23(e)(1) ...........................................................................................5

34 C.F.R. § 668.25(c)(2) ............................................................................................5

34 C.F.R. § 668.25(c)(3) ....................................................................................6, 19, 35

34 C.F.R. § 668.25(d) ................................................................................................6

34 C.F.R. § 668.25(d)(1)(i) ........................................................................................5

34 C.F.R. § 668.25(d)(1)(i)-(2)(i) .............................................................................33

34 C.F.R. § 668.82(a) ..........................................................................................5, 6, 20

34 C.F.R. § 668.82(b)(2) ............................................................................................5

34 C.F.R. § 668.82(c)(2) ............................................................................................5

34 C.F.R. § 668.86(a)(1)(i) .......................................................................................33

## OTHER AUTHORITIES

Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311 (1992) ...........................................................................................................30

**Page(s)**

59 Fed. Reg. 8044 (Feb. 17, 1994) ...................................................................19

59 Fed. Reg. 22,348 (Apr. 29, 1994) ......................................................19, 20

82 Fed. Reg. 49,114 (Oct. 24, 2017).............................................................32

Joselynn H. Fountain, Cong. Research Serv., R45024, *The Campus-Based Financial Aid Programs: Background and Issues* (Nov. 21, 2017), https://sgp.fas.org/crs/misc/R45024.pdf .....................................................4

H.R. Rep. No. 102-447 (1992)........................................................................17

H.R. Rep. No. 102-630 (1992)........................................................................17

S. Rep. No. 102-204 (1991).....................................................................16, 17

## INTRODUCTION

This suit challenges the Department of Education's brand-new assertion of sweeping regulatory authority over tens of thousands of entities providing key services to institutions of higher education across the United States.  The Department's claim has no footing in the Higher Education Act (HEA), and it marks a complete reversal of the Department's own settled interpretation of the relevant statutory provisions.  The Department's unprecedented claim of authority—effectuated in a Dear Colleague Letter demanding full compliance by September 1, 2023—plainly violates the substantive and procedural requirements of the HEA and Administrative Procedure Act (APA).  This Court should ultimately reject the Dear Colleague Letter on the merits.  For now, the Court should issue a stay or preliminary injunction against the compliance deadline that freezes the status quo until this case is finally adjudicated.

Title IV of the HEA establishes federal student financial-aid programs (e.g., federal grants, loans, and work-study programs) and governs the ways in which institutions of higher education and their students participate in those programs.  By extension, the HEA likewise regulates "third-party servicers" that enter into contracts with such institutions to operate their Title IV financial-aid programs.  The HEA and the Department's longstanding regulations carefully define "third-party servicers" to encompass only entities that contract with institutions of higher education to "administer," through "manual or automated processing," their Title IV aid programs.  20 U.S.C. § 1088(c)(1).  To safeguard federal funds, the HEA places extensive requirements on institutions and third-party servicers governing their management of Title IV loan and grant programs.

For decades, the Department has interpreted the HEA's statutory definition of third-party servicers to refer only to entities that themselves administer Title IV financial-aid programs.  But on February 15, 2023, the Department issued a Dear Colleague Letter (corrected on February 16,

2023, and updated on February 28, 2023) radically redefining what a third-party servicer is.  The 2023 DCL goes far beyond the statutory definition to encompass any entity that performs "functions or services necessary . . . [t]o provide Title IV-eligible educational programs," specifically identifying services like recruiting, marketing, software, and curricular development activities that do not involve administering an institution's financial-aid programs.  The DCL's new definition is so broad that it would seem to encompass nearly any entity with a contract to provide services to any Title IV-eligible institution, regardless of whether the entity has any role in managing, disbursing, or processing Title IV financial-aid program funds.

By broadening the definition of third-party servicer, the 2023 DCL imposes an onerous regulatory regime on countless companies that facilitate educational programming and related services but have no role in administering federal financial aid.  Under the HEA, its implementing regulations, and the DCL, an entity's status as a third-party servicer imposes triggers reporting and auditing requirements and heightened fiduciary duties, makes the entity jointly and severally liable to the Department for an institution's Title IV regulatory infractions, and requires the entity to incorporate a long list of mandatory provisions in its contracts with institutions of higher education. The Department also claims the right to order third-party servicers to cease providing services to any institution in certain circumstances.  And the 2023 DCL asserts that neither third-party servicers nor their subcontractors may be located outside the United States or owned by foreigners.

The Department's new third-party servicer definition is unlawful and should ultimately be set aside by this Court.  In the meantime, Plaintiffs and other regulated entities should not be required to restructure their operations—and thereby suffer significant irreparable harm—to comply with the Department's September 1, 2023 deadline.  Plaintiffs therefore request a stay and

preliminary injunction that would preserve the status quo until the case is fully adjudicated on the merits.  All of the traditional factors strongly support granting such interim relief.

*First*, Plaintiffs have a strong likelihood of success on the merits of their APA claims.  The DCL contradicts the HEA's text, purpose, history, and regulations by extending a regime designed to encompass only third parties administering institutions' Title IV financial-aid programs to cover third parties that provide any services in support of their educational programs more generally.  The DCL also arbitrarily forbids third-party servicers from using foreign contractors to provide those services.  And to top it off, the DCL violates the extensive rulemaking procedures set forth in the HEA and APA.  Plaintiffs are likely to win this case.

*Second*, Plaintiffs will suffer immediate and irreparable harm if the September 1, 2023 compliance date holds and they are forced to comply with the third-party servicer regulatory regime while the litigation unfolds.  Such harm includes (1) burdensome and expensive audits; (2) complex revision and renegotiation of hundreds of contracts between Plaintiff 2U, Inc. and partner institutions to reflect new regulatory requirements and expanded liability; and (3) an immediate halt to 2U's reliance on its subsidiary Plaintiff Get Educated International Proprietary Ltd., and other non-U.S. subcontractors to provide services to partner institutions.  These harms will be impossible to remediate when Plaintiffs win this case.

*Third*, the equities run against the Department.  The Department has operated for years on the stable understanding that "third-party servicer" regulations narrowly pertain to entities engaged in the administration of federal financial aid.  No harm would arise if the Department's longstanding interpretation were to prevail for just a few more months while this case is litigated.

*Finally*, the public interest strongly supports a stay.  The 2023 DCL has prompted hundreds of critical comments from a range of entities and individuals who will be harmed by the

Department's redefinition of "third-party servicer."  Those comments explain not only that the 2023 DCL is unlawful, but also that it reflects an uninformed policy that will upset deep-seated educational and contracting arrangements on which countless institutions—and their students— rely.  To protect those institutions and students, the 2023 DCL should be stayed pending this Court's resolution of the case.

## BACKGROUND

### A.    The Higher Education Act

The HEA establishes a variety of federal financial-assistance programs for students pursuing higher education.  *See* Pub. L. No. 89-329, 79 Stat. 1219 (1965); Pub. L. No. 102-325, 106 Stat. 448 (1992).  These include both loan and grant programs.  *See, e.g.*, 20 U.S.C. § 1070a (Federal Pell Grants); *id.* §§ 1070b to 1070b-4 (Federal Supplemental Educational Opportunity Grants); *id.* §§ 1087a-1087j (Federal Direct Loans).  Some programs provide aid funds directly to students, while others funnel funds through colleges and universities.  *See* Joselynn H. Fountain, Cong. Rsch. Serv., R45024, *The Campus-Based Financial Aid Programs: Background and Issues* 1 (Nov. 21, 2017), https://sgp.fas.org/crs/misc/R45024.pdf.   Either way, institutions are responsible for ensuring that Title IV funds are directed to eligible educational programming.

Since 1992, the HEA has authorized institutions of higher education to employ third-party servicers to help them administer Title IV financial-aid programs in various ways, including by assessing student eligibility for Title IV funds, disbursing funds, and servicing and collecting student loans.  *See* 20 U.S.C. § 1088(c); 34 C.F.R. § 668.2.  The HEA defines third-party servicers in relation to their role in administering of an institution's Title IV financial-aid programs.  The statute defines a "third party servicer" as "any individual, any State, or any private, for-profit or nonprofit organization, which enters into a contract with . . . any eligible institution of higher education to administer, through either manual or automated processing, any aspect of such

institution's student assistance programs [under Title IV]."  20 U.S.C. § 1088(c)(1).  It also classifies as third-party servicers lenders or guaranty agencies that "administer, through either manual or automated processing, any aspect of such guaranty agency's or lender's student loan programs" for a Title IV loan program, "including originating, guaranteeing, monitoring, processing, servicing, or collecting loans."  *Id.* § 1088(c)(2).

Because third-party servicers are entrusted with safeguarding federal funds, the HEA and its implementing regulations impose a suite of requirements on them.  Each servicer must undergo an annual compliance audit for its administration of Title IV programs.  *Id.* § 1094(c)(1)(C)(i); 34 C.F.R. § 668.23(a)(3).  Educational institutions must report their partnerships with third-party servicers to the Department.  20 U.S.C. § 1099c(b)(3)(A).  Institutions are barred from contracting with any third-party servicer that has been "terminated" for matters "involving the acquisition, use, or expenditure of [Title IV] funds" or that was "judicially determined to have committed fraud involving [Title IV] funds."  *Id.* § 1094(a)(16)(A); 34 C.F.R. § 668.25(d)(1)(i) (noting that the debarment period lasts for five years).  The Department's Inspector General also has broad license to gain access to a third-party servicer's documents.  *See* 34 C.F.R. § 668.23(e)(1).

The Department's regulations provide that a third-party servicer "acts in the nature of a fiduciary in the administration of Title IV, HEA programs," 34 C.F.R. § 668.82(a), which entails "the highest standard of care and diligence."  *Id.* § 668.82(b)(2).  Servicers must agree to refer to the Department "any information indicating there is reasonable cause to believe that the [educational] institution might have engaged in fraud or other criminal misconduct" relating to Title IV.  *Id.* § 668.25(c)(2).  A servicer may not employ in key positions someone who has been found to have committed fraud or otherwise committed a crime involving governmental funds.  *Id.*

§ 668.82(d)(1).  And the Department has set forth a list of provisions that must be included in any contracts between third-party servicers and their partner educational institutions.

The Department's regulations also create significant potential liability for third-party servicers.  Such entities must agree to be held "jointly and severally liable [with their partner institutions] . . . for any violation by the servicer of any statutory provision of or applicable to Title IV of the HEA, any regulatory provision prescribed under that statutory authority, and any applicable special arrangement, agreement, or limitation entered into under the authority of statutes applicable to Title IV of the HEA."  *Id.* § 668.25(c)(3).  In addition, the Department can impose crippling sanctions for perceived violations of the statutory and regulatory rules governing third-party servicers.  *See id.* § 668.25(d).  For example, a servicer's "failure to submit audit reports . . . in a timely fashion" may lead to disqualification of the servicer from "enter[ing] into a written contract with an institution" for a five-year period.  *Id*.  The Department can also impose severe consequences if it determines that a third-party servicer has violated its fiduciary duties, including by taking "an emergency action" to impose a "fine," or "the limitation, suspension, or termination of the servicer's eligibility to contract with any institution to administer any aspect of the institution's participation in that program."  *Id.* § 668.82(a), (b)(2), (c)(2).

## B.    The Department's Historic Understanding Of Third-Party Servicer

Like the HEA, the Department's regulations have defined third-party servicer to include any "private, profit or nonprofit organization that enters into a contract with an eligible institution to administer, through either manual or automated processing, any aspect of the institution's participation in any Title IV, HEA program."  34 C.F.R. § 668.2.  The regulations further elaborate on what actions may qualify as those performed by third-party servicers, listing eleven activities— each of which relate directly to the administration of student aid.  These include  "[p]rocessing

6

student financial aid applications"; "originating loans"; "[p]rocessing output documents for payment to students"; "[r]eceiving, disbursing, or delivering Title IV, HEA program funds"; and "[l]oan servicing and collection." *Id.* The regulatory definition specifically excludes various administrative tasks, such as mailing documents, warehousing records, and "[p]roviding computer services or software." *Id.*

Over the years, the Department has also issued multiple Dear Colleague Letters and Question & Answer documents providing further elaboration on the third-party servicer definition. *See* Declaration of Charles S. Dameron Ex. (Dameron Ex.) 3 (2012 DCL), Ex. 4 (2015 DCL), Ex. 7 (2017 Q&A). Each of those guidance documents—until the 2023 DCL at issue here—adhered to a limited understanding of "third-party servicer," under which an entity acts as a third-party servicer only insofar as it administers an institution's federal financial-aid programs. To take just one example, a 2017 guidance document expressly states that "perform[ing] a non-Title IV function, such as marketing the institution's academic programs . . . does not make [an] entity or individual a third-party servicer." Dameron Ex. 7 (2017 Q&A) at 10.

## C.     The 2023 DCL's Redefinition Of Third-Party Servicer

On February 15, 2023, the Department issued the 2023 DCL and expressly "rescinded" its earlier guidance concerning the definition of "third-party servicer." Dameron Ex. 1 (hereafter 2023 DCL) at 2. The Department did not acknowledge the narrow contours of its previous guidance respecting the definition of "third-party servicer." But the Department explained that after reviewing "numerous contractual arrangements between institutions and outside entities," it had concluded that "most activities and functions performed by outside entities on behalf of an institution are intrinsically intertwined with the institution's administration of the Title IV

programs and thus the entities performing such activities are appropriately subject to [third-party servicer] requirements." *Id.* at 1.

Handing down a novel definition, the 2023 DCL proclaims that "a [third-party servicer] performs functions or services necessary . . . [t]o provide Title-IV eligible educational programs . . . or [t]o perform any other aspect of the administration of the Title IV programs or comply with the statutory and regulatory requirements associated with those programs." *Id.* at 2.  The 2023 DCL elaborates on that definition with a set of tables presenting a "non-exhaustive list" of functions performed by third-party servicers, including marketing, student recruiting and retention, and developing educational content.  *Id.* at 2-8.

As to student recruiting services, the DCL declares that "[i]nteracting with prospective students for the purposes of recruiting," "providing prospective students with information on educational programs," or "[p]rocessing admissions applications, including the collection of documents," make the entity carrying out those functions a "third-party servicer."  2023 DCL at 3.  As to student retention services, "[m]onitoring academic engagement and/or daily attendance" is now a third-party servicer activity.  *Id.* at 6.  And as to instructional content, "[p]roviding any percentage of a Title IV-eligible program at an institution, including . . . [d]elivering instruction . . . [or a]ssessing student learning, including through electronic means" is enough to trigger third-party servicer status.  *Id.* at 7.  The 2023 DCL acknowledges that the Department "has not previously notified the community that the performance of these functions subjects an entity to [third-party servicer] requirements." *Id.* at 1.

The DCL spells out various follow-on consequences of its new interpretation, including submitting a "Third Party Servicer Data Form" to the Department and hiring an independent auditor "to submit an annual compliance audit" of the third-party servicer activities.  *Id.* at 15.

The DCL also dictates a detailed list of contractual terms that must be incorporated into contracts between institutions and third-party servicers (including mandatory joint and several liability for certain infractions) and "strongly encourage[s]" that such contracts be immediately terminable, without penalty, if the Department (or another governmental actor) initiates certain disciplinary actions against a third-party servicer. *Id.* at 11-12. The 2023 DCL also "prohibit[s]" "both foreign and domestic institutions" from contracting with a third-party servicer "if the servicer (or its subcontractors) is located outside of the United States or is owned or operated by an individual who is not a U.S. citizen or national or a lawful U.S. permanent resident." *Id.* at 2.

The original version of the 2023 DCL, issued on February 15, 2023, became effective "as of the date of publication" on the Department's website, set a May 1, 2023 deadline to comply with its reporting requirements, and invited "[t]he community . . . to submit comments regarding the guidance presented . . . within 30 days" of publication. Dameron Ex. 2 (2023 DCL Feb. 15) at 2, 23. On February 28, 2023, the Department postponed the DCL's effective and compliance dates to September 1, 2023—and extended the comment deadline—after receiving critical comments from the American Council on Education (ACE) and Software & Information Industry Association highlighting the DCL's unrealistic demands. *See* Dameron Ex. 9 (Feb. 23, 2023 ACE Letter), Ex. 10 (Feb. 24, 2023 SIIA Letter). The Department did not indicate whether it would respond to submitted comments. *See* 2023 DCL at 17.

On March 23, 2023, the Department announced that in the fall of 2023 it would initiate a negotiated rulemaking proceeding, potentially to include new regulations governing "[t]hird-party servicers and related issues." Dameron Ex. 11 (Press Release) at 1. The Department did not explain the relationship (if any) between the forthcoming rulemaking and the 2023 DCL's new interpretation of third-party servicer.

On March 30, 2023, the comment period on the 2023 DCL closed.  The Department received over 1,000 comments, including from students, educational institutions, non-profit associations and industry groups, and contractors to colleges and universities.  Many of the comments denounced the DCL's expansive new interpretation as contrary to the HEA and its implementing regulations, complained that the DCL would disrupt educational institutions and their third-party contractors, and emphasized the unworkability of the September 1 effective date.  *See* Dameron Ex. 12 (2U Comment); *see also infra* at 41-45 (discussing other comments).

### D.    Plaintiffs' Businesses

Plaintiff 2U is an online program manager (OPM) that partners with hundreds of public and non-profit colleges and universities—including 22 of the top 25 universities ranked as "Best Global Universities" by *U.S. News & World Report*—to provide high-quality online educational programming ranging from free courses to full degree programs.  Declaration of Bradford R. Adams (Adams Decl.) at ¶ 4.  2U provides partner institutions with a bundle of distance-education technology and services, including learning technology, marketing services, student engagement and support, enrollment application assistance, student recruitment, curriculum design, student career support, faculty support, and other support services needed to deliver online-university programs.  *Id.* ¶ 5.  By providing an online platform, access to capital, technological expertise, and other critical services, 2U helps its partner institutions build, deliver, and support digital education at scale.  *Id.*  Students enrolled in 2U's partner programs frequently outperform campus-based counterparts when it comes to retention and graduation rates.  *See id.* at 3, *see also* Adams Decl. Ex. 1 (2019 Graduate Outcomes Benchmark Report), Ex. 2 (2021 Transparency Report).

2U's relationships with its partner institutions are governed by long-term Master Services Agreements.  Adams Decl. ¶ 11.  Those contracts make clear that 2U has no say in institutions'

decisions regarding tuition, accreditation, curriculum, admissions standards and acceptance, graduation requirements, faculty hiring, student instruction, program size, and financial aid.  *Id.* ¶ 9.  Institutions approve all marketing assets and collateral.  *Id.*  2U has never qualified as a third-party servicer under the HEA or its implementing regulations, and its contracts have been negotiated on the understanding that 2U is not a third-party servicer.  *Id.* at ¶¶ 14-15.  Indeed, 2U's standard contracts expressly state that the institution "shall be solely responsible for the administration of all financial aid programs," that "2U shall not be involved in any manner in the award or disbursement of financial assistance provided pursuant to Title IV of the Higher Education Act of 1965," and that "2U is not, and shall not be reported by [the] University as, a 'third party servicer' (as defined by federal regulations including 34 C.F.R. §§ 668.2 and 668.25)."  Adams Decl. ¶ 15.

Plaintiff Get Educated is an online education company headquartered in Cape Town, South Africa.  For years, Get Educated provided online education services to several U.S. institutions of higher education, including Harvard and MIT, as well as to the University of Cambridge and three leading universities in South Africa.  *Id.* at ¶ 46.  In 2017, 2U purchased Get Educated for $103 million in order to strengthen its position as a global leader in digital education.  *Id.*  Get Educated now operates as a subsidiary and subcontractor of 2U.  *Id.* ¶ 47.  2U has entered into subcontracting arrangements with Get Educated to provide programming support for 2U's institutional partners throughout the United States.  *Id.*

2U qualifies as a third-party servicer under the 2023 DCL's new definition of a third-party servicer.  If the DCL's September 1, 2023 compliance date holds, 2U will be required to comply with the expansive regulatory regime governing such servicers.  Given these harms, on March 30, 2023, 2U filed extensive comments with the Department urging it to rescind the 2023 DCL

immediately.  *See* Dameron Ex. 12 (2U Comment).  On April 4, 2023, Plaintiffs filed this lawsuit seeking equivalent relief.  *See* Compl. 42-43.  And because the Department declined 2U's request for a voluntary stay of the compliance deadline pending the litigation, 2U now seeks a stay and injunction from this Court blocking the DCL until the case is resolved.

## ARGUMENT

Section 705 of the APA provides that, "to the extent necessary to prevent irreparable injury, [a] reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Issuance of such a stay is governed by the same four-factor test that generally governs request for preliminary injunctions, addressing: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)); *see also Nken*, 556 U.S. at 426; *Winter v. NRDC,* 555 U.S. 7, 20 (2008).

All four factors strongly support preliminary relief here.  The 2023 DCL is substantively and procedurally invalid under the HEA and APA, and it threatens immediate and irreparable harm to Plaintiffs, other entities that contract with institutions of higher education, and the institutions (and their students) themselves.  Meanwhile, the Department will suffer no harm from freezing the status quo and keeping in place its own interpretation of the third-party servicer definition that has prevailed for decades.  This Court should stay the DCL's effective date and enjoin the Department from enforcing the DCL pending full adjudication on the merits.

I.      **PLAINTIFFS WILL SUCCEED ON THE MERITS**

The APA directs this Court to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *see also id.* § 702. 2U can show a likelihood of success on the merits of its APA challenge in this case for three independent reasons. *First*, the Department's novel understanding of the statutory phrase "third-party servicer" contradicts the HEA's statutory definition of that phrase, as well as the Department's own prior interpretations and the major questions doctrine. *Second*, the 2023 DCL is arbitrary and capricious because the Department has not properly acknowledged, explained, or justified the significant policy change the DCL effectuates. *Third*, the 2023 DCL violates the procedural rulemaking requirements of the HEA and APA, including as to the September 1, 2023 mandatory compliance date.

A.      **The 2023 DCL's Third-Party Servicer Definition Is Contrary To Law**

The DCL's novel and expansive redefinition of "third-party servicer" contravenes the HEA's text, structure, purpose, context, and history. Nothing in the statutory definition of "third-party servicer" suggests that the Department can designate any organization that administers any aspect of an institution's educational programs as a third-party servicer, so long as the institution receives Title IV funds. To the contrary, the HEA's definition of third-party servicer covers only entities that administer an institution's Title IV *financial-aid* programs.

1.    *The HEA's Definition Of Third-Party Servicer Covers Only Entities That Administer Financial-Aid Programs*

The HEA defines "third party servicer" as follows:

> For purposes of this subchapter, the term "third party servicer" means any individual, any State, or any private, for-profit or nonprofit organization, which enters into a contract with—
>
> (1) any eligible institution of higher education to administer, through either manual or automated processing, any aspect of such institution's student assistance programs under this subchapter; or
>
> (2) any guaranty agency, or any eligible lender, to administer, through either manual or automated processing, any aspect of such guaranty agency's or lender's student loan programs under part B of this subchapter, including originating, guaranteeing, monitoring, processing, servicing, or collecting loans.

20 U.S.C. § 1088(c).

On its face, Section 1088(c)(1)'s definition of "third party servicer" thus covers only entities that "administer . . . any aspect of such institution's *student assistance programs* under [Title IV]." *Id.* § 1088(c)(1) (emphasis added). This language does not encompass entities that administer the institution's *educational* programs, or that provide other non-Title IV services to institutions (such as marketing, recruiting, or retention services).

Section 1088(c)(1)'s limitation of the third-party servicer definition to entities engaging in "manual or automated processing" reinforces that third-party servicers are engaged in the administration of financial-aid programs. That phrase refers to the processing of documents (such as federal financial-aid applications, or financial-aid funds) that are susceptible to "manual or automated processing." And sure enough, Section 1088(c)(2)'s additional (and parallel) definition of third-party servicer confirms that the HEA understands "manual or automated processing" to refer to loan processing. *Id.* § 1088(c)(2) (classifying as a third-party servicer any entity that contracts with a lender or guaranty agency to "administer, through either manual or automated

processing, any aspect of such guaranty agency's or lender's student loan programs under [particular Title IV student-loan programs], including originating, guaranteeing, monitoring, processing, servicing, or collecting loans").[1]

Other HEA provisions confirm that the third-party servicer definition targets only entities administering an institution's Title IV financial-aid programs.  For example, Section 1099c(b)(3) requires educational institutions to provide the Department with "a description of the third party servicers" it works with, and relatedly to "maintain a copy of any contract with a *financial aid service provider or loan servicer*, and provide a copy of any such contract" upon request.  *Id.* § 1099c(b)(3) (emphasis added).  The HEA thus sensibly uses "third-party servicer" as the equivalent of "financial aid service provider or loan servicer"—a category excluding contractors that provide other types of services to the institution.

More generally, the HEA obligations imposed on third-party servicers reflect Congress's concern that such servicers should be trustworthy in administering finances.  For example, the HEA requires servicers to undergo an annual "compliance audit . . . with regard to any contract with an eligible [educational] institution . . . for administering or servicing any aspect of the student assistance programs."  *Id.* § 1094(c)(1)(C)(i).  This audit must be "conducted by a qualified, independent organization or person in accordance with standards established . . . for the audit of governmental organizations, programs, and functions," with results reported to the Department. *Id.*  The HEA also forbids institutions from contracting with a third-party servicer that was "terminated" for matters "involving the acquisition, use, or expenditure of [Title IV] funds" or was

---

[1]     Other provisions of the HEA likewise use "processing" in connection with aid applications and disbursement.  *See, e.g.*, 20 U.S.C. § 1094a(a)(1) (providing that certain institutions may "develop and implement their own comprehensive systems, related to processing and disbursement of student financial aid"); *id.* § 1070a(f)(1) ("Each contractor processing applications for awards under this subpart . . . .").

"judicially determined to have committed fraud involving [Title IV] funds." *Id.* § 1094(a)(16)(A). These requirements seek to ensure the integrity of entities that will be participating in Title IV financial-aid programs involving large quantities of federal funds. They make perfect sense if third-party servicers are those providing such services. But they make no sense as applied to entities that provide other, non-Title IV services to institutions.

Finally, Section 1090(a)(6) bars third-party servicers from charging applicants a fee for "the collection, processing, or delivery of financial aid" forms. *Id.* § 1090(a)(6). As with the others cited above, this provision reflects Congress's understanding that third-party servicers will be directly involved in administering an institution's financial-aid programs.

The HEA's purpose and legislative history confirm that Title IV's definition of third-party servicers is limited to entities performing Title IV financial-aid functions. To state the obvious, Title IV's core function is to establish and operationalize the federal student-aid programs. It is *not* designed to be an all-purpose vehicle for the federal government to oversee higher education in the United States. Indeed, the HEA itself makes clear that the Department cannot use its control over Title IV programs as a backdoor means of regulating institutions' curricula or educational programming. *See* 20 U.S.C. § 3403(b) (forbidding the Department from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction . . . [or the selection of] instructional materials by any educational institution"). Given Title IV's limited focus, it makes sense that the HEA's regulation of third-party servicers is limited to those entities involved in administering Title IV aid programs.

The legislative history of the third-party servicer definition, as enacted in the Higher Education Amendments of 1992, reinforces this conclusion. In the initial Senate version of the legislation, the term "third-party servicer" was entirely absent; instead, the bill used the term "loan

servicer." *See generally* S. Rep. No. 102-204 (1991).  The Senate's initial goal was to "test the idea of allowing greater flexibility in the collection of student loans as a means of enhancing collection results."  *Id.* at 97.  The legislation provided for a "demonstration program" in which private lenders and loan servicers could participate contingent on satisfaction of "strict audit and compliance standards."  *Id.*.  Such audits were intended to examine "the loan portfolio of such eligible lender or loan servicer." *Id.* at 530.

The corresponding House version of the Act (H.R. 3553) substituted the term "third-party servicer" for "loan servicer."  *Compare* S. Rep. No. 102-204, at 353-54 (1991) ("lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies"), *with* H.R. Rep. No. 102-447, at 475 (1992) ("lenders, secondary markets, third party servicers, guaranty agency servicers, and collection agencies").  But the House's stated goal remained the same:  to authorize the Department to "regulate the activities of third-party servicers, *to ensure sound management and accountability of the loan programs*."  H.R. Rep. No. 102-447, at 50 (emphasis added).  And the House version elsewhere made clear the direct connection to federal loans, speaking of the "third party servicer of the loan" or "third party servicers and other organizations involved in providing loans."  *Id.* at 332, 346.  The conference committee report carried forward that understanding, noting that the "participation of national lenders and servicers" was "important to achieving nationwide loan access."  H.R. Rep. No. 102-630, at 508 (1992) (Conf. Rep.).  The legislative history thus aligns with the statutory language:  Third-party servicers "administer" an "institution's student assistance programs" under Title IV.  20 U.S.C. § 1088(c)(1).

> 2.     *The Department Has Long Understood That Third-Party Servicers Must Administer Financial-Aid Programs*

The Department has consistently emphasized—ever since its initial set of third-party servicer regulations in 1994—that to qualify as a third party servicer, an entity must be engaged in

some aspect of administering Title IV aid programs.  As the 2023 DCL acknowledges, until now the Department has *never* understood "third-party servicer" to include entities engaging in marketing, recruiting, curricular development, or engineering online-educational platforms.  2023 DCL at 1.  These features of the Department's longstanding interpretation of the third-party servicer definition are plainly correct.

a.   The Department's regulations generally track the HEA by defining "[t]hird-party servicer" as any "private, profit or nonprofit organization that enters into a contract with an eligible institution to administer, through either manual or automated processing, any aspect of the institution's participation in any Title IV, HEA program."  34 C.F.R. § 668.2(b).  The regulatory definition lists eleven specific activities that qualify as third-party servicer activities:

- "Processing student financial aid applications";

- "Performing [financial] need analysis";

- "Determining student eligibility and related activities";

- "Originating loans";

- "Processing output documents for payment to students";

- "Receiving, disbursing, or delivering Title IV, HEA program funds, excluding lock-box processing of loan payments and normal bank electronic fund transfers";

- "Conducting activities required by the provisions governing student consumer information services [regarding institutional and financial-assistance disclosures]";

- "Preparing and certifying requests for advance or reimbursement funding";

- "Loan servicing and collection";

- "Preparing and submitting notices and applications required [by relevant regulations]"; and

- "Preparing a Fiscal Operations Report and Application to Participate (FSIAP)."

*Id.*

Every single one of these listed activities involves direct support to the institution in its administration of Title IV financial-aid programs.  The Department itself previously explained that this list is meant to "provide a baseline to judge other activities that could be deemed an aspect of the administration of an institution's participation in the Title IV, HEA programs."  59 Fed. Reg. 8044, 8045 (Feb. 17, 1994).  Meanwhile, the regulation specifically exempts several administrative tasks, including "[w]arehousing of records" and "[p]roviding computer services or software."  34 C.F.R. § 668.2.  The Department's interpretation plainly does not encompass activities such as recruiting, marketing, or curricular development.

The Department's contemporaneous explanation of—and justification for—its third-party servicer regulations confirm their limited scope.  For example, in response to comments that the regulatory regime was too burdensome and overly expanded the Department's role, the Department explained that the regulatory prescriptions were necessary to "ensure that institutions and third-party servicers *administer Title IV, HEA program funds properly*."  59 Fed. Reg. 22,348, 22,361 (Apr. 29, 1994) (emphasis added).

The Department's justification for requiring third-party servicers to agree to joint and several liability with the institution confirms the Department's view that third-party servicers would directly administer Title IV assistance, and not merely provide support to the institution's educational programs more generally.  *See* 34 C.F.R. § 668.25(c)(3).  In its initial rulemaking, the Department concluded that nothing "less than the full assumption of liability can fully protect the interest of Federal tax dollars in the form of Title IV, HEA program assistance."  59 Fed. Reg. at 22,405.  Permitting anything less than joint and several liability, the Department feared, would

mean that a servicer could not "perform with the required concern for the proper expenditure of federal funds." *Id.*

The Department provided a similar justification for imposing a fiduciary duty on third-party servicers. *See* 34 C.F.R. § 668.82(a). The Department explained that the servicer's role as "an agent of an institution" is to administer "aspects of the institution's participation in the Title IV, HEA programs." 59 Fed. Reg. at 22,409. Given this, the Department concluded that "it is necessary to hold a third-party servicer to the same level of fiduciary responsibility as the institution in handling or influencing the use of Title IV, HEA program funds." *Id.* For that reason, the Department rejected criticism of its proposed rule banning third-party servicers from hiring individuals convicted of crimes involving government funds. *See id.* at 22,408-09. The Department clarified, however, that only persons with "Title IV-related responsibilities" would be covered by the criminal-background prohibition. *Id.* (also explaining that the criminal background of custodial employees is of no concern because they have "no responsibility for administering a Title IV, HEA program").

b. Since its initial regulations, the Department has consistently adhered to its view that the HEA's third-party servicer definition is limited to entities that administer Title IV financial-aid programs—and does not cover entities that provide other services to an institution's education program more generally.

For example, the Department's 2012 DCL narrowly focused on third-party servicers' role in disbursing and delivering Title IV funds. It specifically reiterated the terms by which institutions could contract with third-party servicers "to carry out title IV programmatic requirements and activities, particularly activities related to delivering title IV credit balances to students directly or through a contractor-supplied financial institution such as a bank or a credit

union." Dameron Ex. 3 (2012 DCL) at 1. The 2012 DCL sought to ensure that third-party servicers responsible for administering Title IV aid programs were qualified and compliant with the Department's regulations. Nothing in the DCL suggested that entities engaged in recruiting, marketing, curricular development, or online-educational-platform management qualified as third-party servicer activities. *See id.*

The 2015 and 2016 DCLs likewise provided detailed technical guidance on activities performed by third-party servicers. The 2015 DCL sought to compile the various regulatory requirements third-party servicers face, including information on required contract provisions, audit requirements, and statutory requirements. Dameron Ex. 4 (2015 DCL) at 1, 3-6. It also listed the types of activities performed by third-party servicers. *Id.* at 1-2. Each of these specific activities, such as giving financial-aid counseling, related to the administration of Title IV programs. *Id.* The DCL never suggested that activities other than those specifically involving Title IV financial-aid programs could qualify a contractor as a third-party servicer. *See id.*

In 2016, the Department reiterated its limited conception of the role of "third party servicers" in a question-and-answer guidance document, complete with a table of activities that do (and do not) qualify as third-party servicer activities. *See generally* Dameron Ex. 5 (2016 DCL). The DCL explicitly said that it did not seek to "make any changes to the regulations related to third-party servicers." *Id.* That limited conception continued through the Department's 2017 guidance. That year, the Department issued a corrected (but substantially similar) version of its 2016 question-and-answer document. *See* Dameron Ex. 6 (Announcement), Ex. 7 (2017 Q&A). Notably, in this guidance, the Department stated that "perform[ing] a non-Title IV function, *such as marketing the institution's academic programs* . . . does *not* make [an] entity or individual a third-party servicer." Dameron Ex. 7 at 10 (emphasis added). And the 2017 guidance

did not claim that student recruitment, curricular development, or management of online-educational platforms were third-party servicer activities.[2]

In short, for nearly three decades, the Department's regulatory actions largely tracked the HEA's narrow understanding that only entities assisting with the administration of Title IV financial-aid programs could qualify as third-party servicers.   The Department has *never* suggested that general support activities—such as recruiting, marketing, developing curricula, or engineering online educational platforms—are enough to trigger third-party servicer status.

3.       *The 2023 DCL's Third-Party Servicer Definition Violates The HEA, The Department's Own Regulations, And The Major Questions Doctrine*

An agency's interpretation of a statute cannot stand when it "is contrary to the plain language of the statute when read as a whole," including "the broader context of the statute." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) (internal quotation marks omitted).   Here, the 2023 DCL interprets the HEA definition of third-party servicer to encompass a wide array of entities that do not "administer, through manual or automated processing, any aspect of such institution's student assistance programs under this subchapter." 20 U.S.C. § 1088(c)(1).   Indeed, the DCL's definition broadly covers virtually any contractor providing any service to an institution's education program, including marketing, recruiting, software, and curricular services having nothing to do with Title IV financial aid.   That expansive interpretation of "third-party servicer" violates the HEA and the Department's regulations.

The 2023 DCL proclaims that the definition of "third-party servicer" encompasses any entity that "performs functions or services necessary . . . [t]o provide Title-IV eligible educational

---

[2]       Along similar lines, the Department's "Third Party Servicer Data Form" has required third-party servicers to "indicate the Title IV, HEA services" by checking one of 16 boxes, 15 of which involve activities directly related to Title IV program administration (with the final box labeled "Other").   *See* Dameron Ex. 38 (Third Party Servicer Data Form) at 3-4.

programs . . . or [t]o perform any other aspect of the administration of the Title IV programs or comply with the statutory and regulatory requirements associated with those programs."  2023 DCL at 2.  The DCL elaborates on that definition with a set of tables presenting a "non-exhaustive list" of functions performed by third-party servicers, including marketing, student recruiting and retention, and developing educational content.  *Id.* at 3.  The DCL offers no statutory analysis justifying this expansive interpretation, other than a conclusory statement that "most activities and functions performed by outside entities on behalf of an institution are intrinsically intertwined with the institution's administration of the Title IV programs and thus the entities performing such activities are appropriately subject to [third-party servicer] requirements."  *Id.* at 1.  The DCL's new definition fails for multiple reasons.

*First*, it squarely contradicts the text of the HEA and its implementing regulations.  The definition of third-party servicer in the HEA and the regulations requires that the entity "administer" the institution's "*student assistance programs* under [Title IV]."  20 U.S.C. § 1088(c)(1); *see also* 34 C.F.R. § 668.2 ("administer . . . the institution's participation in any Title IV, HEA program").  Providing general services to an institution's educational programs is not the same thing as administering the institution's financial-aid program.  A company (like 2U) that helps institutions market its degree programs, recruit students, and develop online educational content does not thereby "administer" that institution's Title IV "student assistance programs."  And it certainly does not do so through "manual or automated processing," as the HEA and regulatory definitions also require.  20 U.S.C. § 1088(c)(1); 34 C.F.R. § 668.2.

The Department's own cited authority expressly rejects the Department's new definition of third-party servicers.  *See* Dameron Ex. 8 (2022 GAO Report).  The 2023 DCL justified its new definition by citing a GAO Report calling for additional transparency and oversight over OPMs

providing serviced to institutions of higher education.  But the GAO Report expressly states that "OPMs typically do not provide colleges with financial aid administration services" and hence are not "third party servicer[s], as the term is defined in the Higher Education Act, *which describes entities that perform specific financial aid administration*."  *Id.* at 14 n.35 (emphasis added); *accord id.* at 2 n.5.  The GAO Report also stated that recruiting services do not qualify as third-party servicer activities under the HEA.  *See id.* at 7 n.20 ("[A]n OPM that provides recruiting services, but does not administer federal student aid funds, would not be considered a third party servicer.").  The GAO Report's conclusions fit perfectly within the traditional understanding that third-party servicers are entities responsible for administering Title IV aid programs.

The Department's anti-textual interpretation of the third-party servicer definition is extraordinarily broad and has no viable limiting principle.  For example, as ACE explained in its comment letter urging the Department to rescind the 2023 DCL, the new definition would appear to sweep in a wide array of entities—including hospitals, police departments, publishers, study-abroad programs, and high schools schools—that have no plausible connection to federal financial aid.  *See* Dameron Ex. 13 (ACE Comment) at 3.  As other commenters noted, the 2023 DCL's definition is "overly broad and vague," Dameron Ex. 14 (Unizin Comment) at 1, "seemingly unbounded," Ex. 15 (EDUCAUSE Comment) at 3, an "expansive rewrite," Ex. 16 (Univ. of Dayton Comment) at 2, and a "massive expansion," Ex. 17 (NYU Comment) at 1.  Given the statutory text, there is no justification for interpreting third-party servicer to encompass entities that play no role in administering Title IV programs.

*Second*, the 2023 DCL's overbroad definition of third-party servicer has no relationship to the clear purpose of the third-party servicer regulatory scheme.  As discussed above, that scheme is designed to preserve the integrity of federal financial-aid programs and thus to protect the public

fisc.  The extensive rules governing third-party servicers—including the imposition of a fiduciary standard of care, joint and several liability, and bar on employment of individuals convicted of misusing government funds—make sense only because that category is limited to entities that administer Title IV federal financial aid.  It makes no sense to apply these restrictions to entities that merely design curricula, advertise degree programs, or help recruit students.

*Third*, the 2023 DCL marks a sharp break from the Department's decades-long—and far more limited—understanding of Section 1088(c)(1).  *Supra* at 17-22.  Surely if the HEA had truly mandated that entities engaged in marketing, recruiting, or curricular development qualify as third-party servicers, the Department would have realized as much at some point over the past thirty years.  But it has never done so until now.  To the contrary, the Department expressly said in 2017 that "marketing" is not a Title IV activity performed by third-party servicers.  *See* Dameron Ex. 7 (2017 Q&A) at 10.  The Supreme Court has instructed courts to be skeptical when agencies "'claim to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [their] regulatory authority.'"  *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Here, the authority claimed by the Department is not just "unheralded"; it was expressly *disclaimed* just a few years ago.

*Fourth*, the 2023 DCL declares that "an institution may not contract with a [third-party servicer] to perform any aspect of the institution's participation in a Title IV program *if the servicer (or its subcontractors) is located outside of the United States or is owned or operated by an individual who is not a U.S. citizen or national or a lawful U.S. permanent resident*."  2023 DCL at 2 (emphasis added).  This sweeping ban on foreign third-party servicers and subcontractors is entirely made up.  It appears nowhere in the HEA or in the Department's regulations.  Unsurprisingly, the 2023 DCL identifies no legal authority for the ban.  And although the DCL

invokes the broad policy goal of "protect[ing] the interests of institutions, taxpayers, and students," it offers no explanation for why such protections are needed.  *Id.*[3]  The Department lacks statutory authority to impose a drastic ban on foreign entities by regulatory fiat.

*Finally*, and most fundamentally of all, the Department has ignored the essential role of Congress—and violated the major questions doctrine—by issuing the 2023 DCL without clear statutory authorization.  By redefining third-party servicers to encompass virtually any outside entity providing services to an educational institution, the DCL expands the Department's authority over higher education; disrupts longstanding contractual relationships between institutions and contractors; exposes tens of thousands of newly-designated third-party servicers to new fiduciary duties, joint and several liability, and audit requirements; and forbids foreign entities from providing services to U.S. institutions of higher education.  As ACE has explained, the net result will be "significant disruption and termination of critical education services to students and the reallocation of funds from educational purposes to compliance efforts."  Dameron Ex. 13 (ACE Comment); *see also* Ex. 17 (NYU Comment) at 1 ("Between compliance costs for both universities and vendors, reduction in competition, and difficulties with maintaining global study opportunities, the [2023 DCL's] expansion of TPS will negatively impact some combination of student learning, student experience, student success, and average cost of attendance.").

The major questions doctrine precludes this result.  As explained by the Supreme Court, that doctrine requires the Department to "point to clear congressional authorization" when claiming "extravagant statutory power" or the authority to "make a radical or fundamental change

---

[3]   Nor does the DCL explain how the ban is sensible (or even workable) as applied to foreign institutions eligible to participate in the Title IV aid program—or to U.S.-based universities running study abroad programs.  Surely such programs should be able to rely on local contractors to help provide educational programming to their students.

to a statutory scheme." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted). The Department has no such clear authorization here; indeed, it lacks even a "plausible textual basis" for its action. *Id.* Congress "could not"—and did not—intend "to delegate such a sweeping and consequential authority" in a narrow definitional provision. *Id.* at 2608 (internal quotation marks omitted). The 2023 DCL is yet another manifestation of a "recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 2609; *see also, e.g.*, *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022) (per curiam). The major questions doctrine addresses that problem and invalidates the DCL.

### B. The 2023 DCL Is Arbitrary And Capricious

An agency's failure to "at a minimum acknowledge [a] change [in position] and offer a reasoned explanation for it" is arbitrary and capricious. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). The 2023 DCL is arbitrary and capricious because it unambiguously transforms the Department's policy regarding the classification of certain entities as "third party servicers," and it fails either to meaningfully acknowledge that change or to provide any reasonable explanation for it. It must therefore be set aside. *See* 5 U.S.C. § 706(2); *Carlson*, 938 F.3d at 351.

That the 2023 DCL reflects a significant change in Department policy is irrefutable. Beyond the general discussion above, *see supra* at 25, two examples merit particular attention. First, per the 2023 DCL, "[p]reparing and/or disseminating promotional materials to market educational programs if the entity or individual provides any technology, curriculum, or faculty, or is otherwise involved in the design or delivery of educational programs" qualifies an entity as a third-party servicer. 2023 DCL at 4. But the Department's 2017 guidance unequivocally said just the opposite: "perform[ing] a non-Title IV function, such as marketing the institution's

academic programs . . . does not make that entity or individual a third-party servicer."  Dameron Ex. 7 (2017 Q&A) at 10.

Second, the 2023 DCL declares that "[p]roviding computer services or software in which the provider has access to, or maintains control over, the systems needed to administer any aspect of the Title IV programs . . . including, but not limited to, . . . recruitment and enrollment, admissions, registration, billing, and learning management" is a third-party servicer activity. 2023 DCL at 6.  But the Department's regulations and prior guidance flatly contradict that determination.  Indeed, in the Department's regulatory definition of third-party servicer (currently in force), "[p]roviding computer services or software" is expressly "*[e]xclude[d]*" from treatment as a third-party servicer activity.  34 C.F.R. § 668.2 (emphasis added).  And again, in its 2017 question-and-answer guidance, the Department explained that a provider of computer services or software is not a third-party servicer, "as long as the provider is not responsible for using the software for the institution's student aid purposes."  Dameron Ex. 7 (2017 Q&A) at 9.  The Department has never previously suggested that providing software unrelated to the administration of Title IV financial-aid programs makes a provider a third-party servicer.

Yet the 2023 DCL does not meaningfully acknowledge any change in position.  All the Department says is that its prior guidance, including the 2012 and 2016 Dear Colleague Letters (inclusive of the 2017 Q&A guidance), is "rescinded."  2023 DCL at 2.  It also concedes that "the Department has not previously notified the community" that performing actions such as marketing, recruiting, or curricular development "subjects an entity to [third-party servicer] requirements."  *Id.* at 1.  Otherwise, the 2023 DCL reads as if it is restating what the Department has always held.  Indeed, the Department asserts that the DCL simply "updates guidance to institutions that contract with a third-party servicer."  *Id.*

The Department justifies its new guidance by saying that it "has reviewed numerous contractual arrangements" and concluded that "most activities and functions performed by outside entities on behalf of an institution are intrinsically intertwined with the institution's administration of the Title IV programs." *Id.* It then contends that a proper understanding of the HEA requires the Department to treat those contractual relationships as "third-party servicer" contracts within the meaning of the HEA. *Id.* The DCL never openly acknowledges that this new understanding is directly contrary to previously expressed understandings. Yet the Department is not at liberty to "depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency fails to both acknowledge a change in position and "offer a reasoned explanation for it," the action is arbitrary and capricious under the APA. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923. The Department's failure to forthrightly acknowledge the change it is making violates the APA. *Id.*

Even if the Department could be said to have acknowledged its change of position, it offered no justification for that change. The 2023 DCL never suggests that its past guidance was wrong, explains why changes are necessary, or considers the harm it will create to the "serious reliance interests" built around past regulatory actions. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *accord Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 33-34 (D.D.C. 2019) (finding that the Department violated the APA when it failed to "'display awareness' of its changing position, provide reasoned analysis for that decision, and take into account any serious reliance interests affected"). Nor does the DCL explain why it makes any sense to apply a regulatory regime designed to govern entities administering federal Title IV funds to outside entities that have nothing to do with Title IV. The Department's

manifest failure to explain its sweeping change in position is arbitrary and capricious.  The DCL

fails on that basis as well.

### C.    The Department Unlawfully Failed To Proceed Through Negotiated Rulemaking In Redefining "Third-Party Servicer"

The 2023 DCL also violates the rulemaking requirements of the HEA and the APA because

it is a transparent attempt to fashion a new legislative rule in the guise of informal guidance.  The

Department does not enjoy discretion to forego statutorily prescribed rulemaking procedures.  *See*

*Bauer v. DeVos*, 325 F. Supp. 3d 74, 96-97 (D.D.C. 2018).  Where an agency circumvents

mandatory procedures by publishing a new legislative rule in the form of a guidance document,

that guidance document must be vacated.  *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 385 (D.C. Cir.

2002).  That is precisely what should happen here.

Although the Department characterizes the 2023 DCL as a guidance document, it bears all

the hallmarks of a new legislative rulemaking that binds private parties (including Plaintiffs).  It is

well settled that an agency's decision to label a new piece of regulation as a "guidance document"

or "statement of policy" is not sufficient to bring such agency action outside the scope of the APA's

notice-and-comment requirements.  *Id.* at 382-83.  Rather, the key inquiry is "whether the agency

action binds private parties or the agency itself with the 'force of law.'"  *Id.* at 382.  Thus, if "a

document expresses a change in substantive law or policy (that is not an interpretation) which the

agency intends to make binding, or administers with binding effect, the agency . . . must observe

the APA's legislative rulemaking procedures."  *Id.* at 382-83 (quoting Robert A. Anthony,

*Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal*

*Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311, 1355 (1992)).

The 2023 DCL plainly fits that description:  It announces a significant (if unacknowledged)

change in the regulatory regime governing third-party servicers, vastly expands the entities that

may be subjected to the "requirements" of those regulations, and does so in a way that purports to bind private parties as of the effective date (September 1, 2023) identified in the guidance. 2023 DCL at 1-2. The 2023 DCL therefore purports to lay down a legislative rule.

Under the HEA, in order to promulgate a legislative rule, the Department must undertake a "negotiated rulemaking" process where it "shall obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs . . . , such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." 20 U.S.C. § 1098a(a)(1). Next, the Department must prepare draft regulations for review by representatives of these various industry groups. *Id.* § 1098a(b)(1). The Department must then "take into account the information received through such mechanisms in the development of proposed regulations" and "publish a summary of such information in the Federal Register together with such proposed regulations." *Id.* § 1098a(a)(2).

In addition to these HEA requirements, the APA requires agencies to give the public notice and opportunity to comment before promulgating legislative rules. 5 U.S.C. § 553. These APA notice-and-comment rulemaking requirements also apply to the Department. *See, e.g.*, *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50, 73-75 (D.D.C. 2017).

The Department flouted these procedural requirements when promulgating the 2023 DCL. It did not solicit public input prior to drafting the DCL's terms; nor did it submit draft terms to industry representatives, as required by the HEA for negotiated rulemaking. 20 U.S.C. § 1098a(a)-(b)(1). No group of industry representatives was ever impaneled to review the DCL's draft terms. *Id.* § 1098a(b)(1). And nothing was published in the Federal Register or otherwise submitted to

the public for comment.  *Id.* § 1098a(a)(2); 5 U.S.C. § 553(b).  The DCL therefore does not come close to meeting the procedural rulemaking requirements of the HEA and APA.

Finally, the 2023 DCL is procedurally flawed in another respect:  Its September 1, 2023 enforcement date independently violates the HEA's "master calendar" requirement.  *See* 20 U.S.C. § 1089.  The HEA states that "any regulatory changes initiated by the Secretary affecting [Title IV] programs," if published after November 1 of a given year, "shall not become effective until the beginning of the second award year after such November 1 date"—i.e., until July 1 of the second year after the current year.  *Id.* § 1089(c)(1); *see also id.* § 1088(a)(1) (defining an "award year" as "beginning July 1").  For example, if a regulation is published on November 15, 2023, it cannot become effective until July 1, 2025 at the earliest.  Congress enacted the master calendar requirement to ensure that institutions have sufficient notice of the timing of any regulatory change in order to implement regulatory changes at the start of each award year.  *See* 82 Fed. Reg. 49,114, 49,116 (Oct. 24, 2017).

The 2023 DCL violates the HEA's master calendar requirement by trying to make a regulatory change effective in the middle of an award year.  Under the HEA, in order to set an effective date of September 1, 2023 for the 2023 DCL, the Department would have had to promulgate the 2023 DCL on or before November 1, 2022.  *See* 20 U.S.C. § 1089(c)(1); *cf. id.* § 1088(a)(1) (defining award year).  Under the plain terms of the HEA, because the 2023 DCL was "not . . . published in final form by November 1 prior to the start of the award year," it "shall not become effective until" July 1, 2024.  The September 1, 2023 effective date provides yet another reason to invalidate the DCL.

## II.     PLAINTIFFS FACE IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

If Plaintiffs are forced to comply with the 2023 DCL by September 1, 2023, they will suffer immediate and irreparable harm.  Over the coming months, 2U would be forced to undertake new auditing and records obligations; conduct additional diligence; revise and renegotiate 180 contracts with numerous partner institutions; and substantially diminish the operations of a subsidiary for which it paid over $100 million just five years ago.  Compliance would be costly and burdensome.   And non-compliance is not an option, as it would expose 2U to serious consequences if the Department takes enforcement action.  *See* 34 C.F.R. § 668.86(a)(1)(i); *see id.* § 668.25(d)(1)(i)-(2)(i).  A stay and injunction is necessary to avert these harms.

### A.     2U's Direct Compliance Obligations Will Inflict Irreparable Harm

The 2023 DCL directly subjects 2U to substantial and burdensome compliance obligations. For example, each servicer must undergo an annual compliance audit for its administration of Title IV programs.  20 U.S.C. § 1094(c)(1)(C)(i); 34 C.F.R. § 668.23(a)(3); *see also* Dameron Ex. 39 (Title IV Audit Guide) (laying out detailed procedures for third-party servicer audits).  Although the extent of 2U's obligations under such audit requirements remain unclear, they will nevertheless pose a significant compliance burden for 2U.  *See* Adams Decl. ¶¶ 39-45; *see also* Dameron Ex. 13 (ACE Comment) at 4 (noting that audits often cost between $40,000 and $50,000).

As a third-party servicer, 2U would also be subject to new paperwork requirements, records policies, information-safety protocols, and reporting requirements.  *See supra* at 5-6.  For example, 2U would be required "to implement and maintain" "safeguards for customer information" under the Gramm-Leach-Bliley Act (which establishes information-security requirements for financial institutions, which 2U is not).  2023 DCL at 11; Adams Decl. ¶ 41.  It would be required to "[r]efer any suspicion of fraudulent or criminal conduct regarding administration of the institution's Title

IV programs" to the Department.  2023 DCL at 11.  And 2U's contracts with partner institutions would also be subject to inspection and review by the Department at any time.  20 U.S.C. § 1099c(b)(3)(A); 2023 DCL at 11.  None of these requirements currently applies to 2U.

These compliance steps will be costly and burdensome.  And because the APA does not waive sovereign immunity for actions for damages, the costs cannot be recovered even if Plaintiffs ultimately prevail in this action.  5 U.S.C. § 702 (providing for relief "other than money damages"); *see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).

Unrecoverable losses like these qualify as irreparable harm.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (applicants "at risk of irreparable harm" where government action "depriv[ed] them of rent payments with no guarantee of eventual recovery"); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) ("Where a plaintiff 'cannot recover damages from the defendant due to the defendant's sovereign immunity . . . any loss of income suffered by plaintiff is irreparable *per se*.'" (alteration in original) (citation omitted)).

## B.     The 2023 DCL Requires 2U To Revise And Renegotiate Its Contracts With Its Partner Educational Institutions

The 2023 DCL will also force 2U to revise and renegotiate each and every one of the contracts governing 2U's provision of services for some 180 degree-granting programs at colleges and universities around the country.  Adams Decl. ¶ 21.  By its terms, the 2023 DCL requires 2U to insert various provisions into its contracts with educational institutions, many of which will override or conflict with existing contractual terms.  And the new risks and liabilities imposed by the DCL will, as a practical matter, require 2U to seek additional substantive changes to its contractual relationships.  The DCL's forced transformation of 2U's business relationships is a clear form of irreparable harm.  *See FTC v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019).

First, the 2023 DCL expressly requires a laundry list of new contractual provisions in all contracts between third-party servicers and the institutions they serve.  Among other things, every entity now designated as a third-party servicer "must agree to":

- "Be jointly and severally liable with the institution for any violation of Title IV requirements resulting from the functions performed by the servicer";

- "Comply with all applicable statutory, regulatory, and other Title IV requirements, including submission of [third-party servicer] compliance audits";

- "Refer any suspicion of fraudulent or criminal conduct regarding administration of the institution's Title IV programs" to the Department;

- "Confirm student eligibility and return Title IV funds (if required) when a student withdraws from the institution if the servicer disburses Title IV funds";

- "Return all records related to the servicer's administration of the institution's participation in the Title IV programs to the institutions . . . if the contract with the institution is terminated, or the servicer ceases to perform any functions prescribed under the contract for any reason"; and

- "[I]dentify each subcontractor and clearly describe the functions performed on behalf of the servicer and institution by the subcontractor."

2023 DCL at 11. All of these new provisions impose additional, one-sided requirements on 2U.

Several of these mandatory provisions will override current provisions in 2U's contracts. For example, any existing contractual provision limiting 2U's liability for the liabilities of its partner institutions or providing for indemnification from its partner institutions must now be rewritten in light of the 2023 DCL's joint-and-several liability mandate, which—contrary to the Department's own regulations, *see* 34 C.F.R. § 668.25(c)(3)—appears to hold servicers responsible for harm caused by their "functions," even if the servicer's own conduct was entirely innocent and the harm at issue was due to the *institution's* misconduct.  Adams Decl. ¶ 27.

In addition, the 2023 DCL "strongly encourage[s]" institutions and third-party servicers "to include provisions in any contract to terminate the contract immediately, without penalty," if

the Department (or another governmental actor) takes certain disciplinary actions against a third-party servicer.  2023 DCL at 11-12.  That is a significant change for 2U, whose existing contracts include carefully crafted termination provisions designed to reflect the long-term nature of their partnerships and the significant upfront investment 2U makes in each of its degree programs (on average, around $5 million), which it recoups only over long contractual terms (typically 10 years or more).  Adams Decl. ¶ 12.  Specifically, 2U's existing contracts generally: (1) do not allow for termination for convenience; (2) allow for termination for breach only if the breach is not cured within a significant period of time; and (3) provide that, in the event of the termination or expiration of a contract, 2U will provide a teach-out period to ensure that students are taught through the remainder of their program, that the program is transitioned in an orderly fashion, and that 2U is compensated for such services.  *Id.*  The Department's "strong[] encourage[ment]" of new immediate termination provisions is already leading 2U's partner institutions to begin demanding such provisions.  *Id.* ¶¶ 22-24.

More broadly—and beyond the mandatory and recommended contractual changes—the 2023 DCL also transforms the risk profile of certain services that 2U offers to its institutional partners.  Once the contracts between 2U and those partners are reopened, the terms on which 2U offers those services will have to be renegotiated.  For example, the 2023 DCL requires third-party servicers to be jointly and severally liable with institutions for any liability arising from "functions" carried out by the third-party servicer.  2023 DCL at 11.  As a result, the Department could take the position that 2U is now jointly liable for any misrepresentation made by an institution on 2U-disseminated marketing materials—even if 2U was entirely unaware of the misrepresentation.  Adams Decl. ¶¶ 27-28.  Enhanced liability will enhance the financial risks of 2U's marketing and recruiting activities.

Similarly, the Department could seek to tag 2U with joint and several liability in connection with a university partner's failure to obtain state authorization for distance learning. Adams Decl. ¶ 30. 2U currently assists institutions in obtaining such authorizations, but doing so may no longer be worth the risks.

Given the change in 2U's potential exposure to liability, 2U will likely need to try to renegotiate the scope and price of those (and other) services. *Id.* ¶¶ 21-38. Such renegotiation would also need to encompass other contractual provisions laying out the precise details of the parties' respective rights and responsibilities, both as to the services 2U provides (and does not provide) and as to other key terms such as indemnification, limitations of liability, representations and warranties, and termination. *Id.* ¶¶ 34-38.

Renegotiation is not a casual undertaking: 2U's contracts with its partner institutions are complex instruments that provide a flexible framework for a successful long-term partnership, with initial terms typically more than ten years long. *Id.* ¶ 11. Negotiations involve a wide variety of internal and external stakeholders for each contracting party, and they generally take many months for each contract. *Id.* ¶ 13. The 2023 DCL forces 2U to renegotiate the contracts governing *all* of the 180 degree-granting programs it operates *in advance of September 1, 2023*. Given the number of negotiations and the magnitude of the required changes, it is not clear that all of them will succeed in advance of the 2023 DCL's September 1, 2023 effective date. *Id.* ¶ 37. It is therefore foreseeable that 2U could lose customers as a result of the 2023 DCL. *See id.* And even as to those negotiations that do ultimately succeed, it is likely that at least some of these new contracts will be less favorable to 2U. *See id.* And if the 2023 DCL prompting these changes is later set aside, it will be nearly impossible to turn back the clock and reinstate the current arrangements. *Id.* ¶ 38.

The 2023 DCL thus profoundly unsettles 2U's business.  As courts have recognized, a company suffers irreparable harm when it is forced into widespread contractual renegotiations which result in fundamental business changes.  *See, e.g.*, *Qualcomm Inc.*, 935 F.3d at 756 (irreparable harm established where company was required "to enter new contractual relationships and renegotiate existing ones on a large scale," leading to "fundamental business changes" that "cannot be easily undone").  The loss of customers causes similar irreparable harm.  *See, e.g.*, *Feinerman v. Berardi*, 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008) (irreparable harm where "business may be severely damaged because [l]ong-standing clients . . . [may be] unwilling, or unable, to do [further] business").  So too does the loss of attractiveness as a commercial partner in light of increased business risks.  *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 113 (D.D.C. 2020).  All of this harm to 2U is "certain but difficult to value," rendering it irreparable.  *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 386 (D.D.C. 2017) (citing *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005)).

### C.      The 2023 DCL Irreparably Harms 2U's Relationship With Get Educated

Beyond alterations to 2U's relationships with its institutional partners, the 2023 DCL also fundamentally disrupts 2U's relationship with its subsidiary, Get Educated, which is headquartered in Cape Town, South Africa.  Adams Decl. ¶ 47.  In 2017, 2U purchased Get Educated for $103 million, which gave 2U access to a talented workforce in Cape Town.  *Id.* ¶ 46.  2U currently subcontracts with Get Educated to provide marketing and course-content services for several degree-granting programs at universities in the United States.  *Id.* ¶ 47.

Absent preliminary relief from this Court, 2U will be forced to stop subcontracting with Get Educated to provide services to Title IV institutions.  As noted above, the 2023 DCL expressly provides that "an institution may not contract with a [third-party servicer] to perform any aspect

of the institution's participation in a Title IV program if the servicer (or its subcontractors) is located outside of the United States."  2023 DCL at 2.  This prohibition expressly "applies to both foreign and domestic institutions."  *Id.*  Thus, with respect to every Title IV-eligible institution (foreign and domestic) for which Get Educated currently serves as a 2U subcontractor, 2U will be forced to find an alternative subcontractor in the United States, or to take that work in-house, at significant cost to 2U.  Adams Decl. ¶ 49.

The 2023 DCL not only substantially vitiates 2U's significant investment in Get Educated, but will impose substantial, irreparable costs on 2U in the interim as 2U works to find alternative resources to support its existing partnerships with academic institutions.  Here, again, the 2023 DCL compels "fundamental business changes" that "cannot easily be undone" and thereby causes irreparable harm to 2U.  *Qualcomm Inc.*, 935 F.3d at 756; *see also Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (finding "irreparable harm" where "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied").  Furthermore, it deprives 2U of access to the talented pool of distance-education specialists who work at Get Educated's Cape Town offices.  Adams Decl. ¶ 46; *see Luokong Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) ("[L]oss of talent and the inability to 'recruit and retain employees to build—or even maintain—[a plaintiff's] business' also constitutes irreparable harm." (second alteration in original) (quoting *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83-84 (D.D.C. 2020))).

All of these changes also clearly and irreparably harm Get Educated, which because of the 2023 DCL will find itself unable to conduct its business with respect to any Title IV-eligible institutions.  *See Nalco Co.*, 786 F. Supp. 2d at 188.  If an "imminent inability to compete for [a] contract cannot be remedied without an injunction," *Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp.

3d 277, 290 (D.D.C. 2018), then it is necessarily the case that Get Educated will suffer irreparable harm from its imminent inability to enter into *any* contract (or subcontract) with *any* foreign or domestic institution that receives *any* Title IV funds.  The 2023 DCL forces 2U and Get Educated into a Catch-22:  Comply with unlawful government action and "incur large costs which . . . will disrupt and change the whole nature of" their business, or refuse to comply and lose "all of that part of" their business.  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009).

Finally, the 2023 DCL's ban on foreign subcontractors applies not only to subcontractors *located* abroad, but also to those "*owned* or *operated* by an individual who is not a U.S. citizen or national or a lawful U.S. permanent resident."  2023 DCL at 2 (emphasis added).  This aspect of the DCL will inflict enormous burdens in requiring 2U to identify not only the location of each of its subcontractors, but also the citizenship and residency status of any individual who owns or operates a subcontractor.  2U currently contracts with multiple companies that provide services to 2U from foreign countries, at an annual cost of millions of dollars.  Adams Decl. ¶ 50.  The 2023 DCL will require 2U to cease using those subcontractors, identify and cut off any other subcontractors that might be owned or operated by foreign persons, and find new ways of providing the services at issue.

## III.    THE EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

The balance of the equities and the public interest also favor 2U.  These two factors "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  Here, neither the public nor the Department will suffer harm if this Court preserves the status quo by granting 2U immediate relief.  After all, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Gordon v. Holder*,

721 F.3d 638, 653 (D.C. Cir. 2013).  In fact, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  The Department suffers no injury in being required to follow its statutory mandate.

That is especially true where, as here, the Department's U-turn on third-party servicers reverses a policy that has been in place for three decades, and where, as here, the Department itself already pushed back the effective date by several months in light of the widespread disruption already wrought by the 2023 DCL.  *Supra* at 9.  Given the Department's self-imposed delay, the Department could not possibly assert any harms to its interests if the effective date were pushed back slightly further to allow for this litigation to proceed.  In light of longstanding reliance interests that the Department itself seems (albeit belatedly) to have recognized, there is no plausible account for why the Department's decades-long understanding should not remain in place for just a few more months while this case is litigated.  In short, the equities lie firmly in Plaintiffs' favor.

The public interest also clearly supports entry of a stay broadly protecting universities and their contractors during the pendency of this litigation.  For the reasons explained above, the 2023 DCL clearly harms 2U and similarly situated companies that provide educational services to institutions of higher educations.  *See supra* 33-40; *see also* Dameron Ex. 18 (Duane Morris LLP Comment) at 3 (commenting on behalf of "OPMs, specialized service providers, marketing companies and other individuals and entities that provide critical, necessary, and important services to colleges and universities"); Exs. 19-23 (comments from Ellucian, Wiley, Coursera, Pearson, and McGraw Hill).

Perhaps even more importantly, the 2023 DCL has sown widespread confusion and alarm among institutions of higher education and their students.  As ACE noted in its March 29 comment

letter on behalf of itself and 85 associations of higher education around the country, it is not possible to "overstate the concerns and anxiety that the DCL has caused for institutions and students."  Dameron Ex. 13 (ACE Comment) at 6.  If the DCL remains in place in the run-up to its September 1, 2023 effective date, there will likely be "significant disruption and termination of critical education services to students and the reallocation of funds from educational purposes to compliance efforts."  *Id.* at 7.  The numerous comments the Department has received from members of the higher-education community speak to the indisputably disruptive consequences of the 2023 DCL—consequences the Department seems not to have contemplated in its haste.  *See, e.g.,* Dameron Ex. 16 (Univ. of Dayton Comment), Ex. 17 (NYU Comment), Ex. 24 (Univ. of California Comment), Ex. 25 (UMBC Comment), Ex. 26 (Rhodes College Comment); Ex. 29 (Univ. of Texas System Comment).

Start with the 2023 DCL's nearly boundless expansion of "third-party servicer."  Critical educational tools like Zoom, Google Docs, and Adobe apparently fall under the DCL's "intrinsically intertwined" test.  *See* Dameron Ex. 17 (NYU Comment) at 1.  Even Amazon, whose cloud-computing services are used by educational institutions, is sufficiently concerned by the scope of the 2023 DCL that it has sought clarification that "cloud service providers are excluded."  Dameron Ex. 27 (AWS Comment) at 2.  Indeed, information technology and digital learning "are integrated into every aspect of student interaction with institutions," such that "any immediate disruption will cause chaos in the near term."  Dameron Ex. 14 (Unizin Comment) at 4.  Software companies which "maintain[ ] access" to their software in order to "provide technical support" are now apparently subject to Title IV; so too are "companies offering interns[hips] or externships for course credit."  Dameron Ex. 28 (SHRM Comment) at 3-4.  As the EDUCAUSE's comment letter explains, "the DCL has the potential to severely disrupt the content, software, systems, and service

provider relationships on which higher education institutions rely." Dameron Ex. 15 (EDUCAUSE Comment) at 7.

The DCL's expanded definition of "third-party servicer" affects a striking range of actors that clearly do not fall within the Department's regulatory authority. For example, the American Association of Publishers noted that the 2023 DCL "would create insurmountable economic regulatory burdens on education publishers" and "undermine academic freedom." Dameron Ex. 34 (AAP Comment) at 2. And hospitals are concerned that classifying clinical settings as third-party servicers "would place an undue burden on" healthcare providers, and thus "lead to the loss of additional clinical sites" and "decreased enrollment capacity, increased workforce shortages, inability to access care, [and] worsening health outcomes." Dameron Ex. 31 (Missouri Hosp. Ass'n Comment) at 1-2; *see also* Ex. 32 (Seattle Children's Hosp. Comment), Ex. 33 (Wash. Dep't of Health Comment).

As a result of the Department's expansive new definition, each institution of higher education will need "time to conduct an in-depth and individualized review of each contract and relationship with each outside entity." Dameron Ex. 29 (Univ. of Texas System Comment) at 1. For some institutions, the contracts that need to be reviewed "could number in the hundreds and include things like learning management system providers, textbook publishers, and consortium arrangements with other institutions of higher education." *Id.* Indeed, the DCL "may lead institutions to cancel contracts and/or avoid purchasing the very services that are most critical for student success." *Id.* And these "overwhelming" compliance burdens rain heaviest on "smaller and/or resource-challenged institutions." Dameron Ex 15 (EDUCAUSE Comment) at 7; *see also* Ex. 13 (ACE Comment) at 4 ("The compliance effort required by the DCL is substantial for all institutions, and particularly burdensome for smaller, lower-resourced institutions, which are

unlikely to have a dedicated general counsel on campus or the staff needed to conduct this review of contracts, pursue necessary contract modifications, or seek alternative providers.").

The consequences of the 2023 DCL's foreign-owned ban are equally problematic. According to the International Education Council, that ban "will impose impossible conditions on many institutions of education inside and outside the United States that would . . . eliminat[e] the ability of many Americans to enroll in foreign institutions or study abroad." Dameron Ex. 30 (International Education Council Comment) at 3. Universities have "deep concern" that the 2023 DCL "will have a devastating effect on international education programs and global initiatives." Dameron Ex. 29 (Univ. of Texas System Comment) at 2. In turn, the DCL "will make it more challenging to attract, recruit, and retain top-tier international students," which "will adversely impact the global competitiveness of U.S. institutions of higher education, with significant academic and economic consequences." *Id.* As ACE has explained, with respect to many contracted-for services, "it is simply not possible to transition from a foreign provider to a U.S. provider in a short period of time." Dameron Ex. 13 (ACE Comment) at 5. And even where institutions will be able to comply, "the DCL will impose major disruptions and significant costs, resulting in negative impacts for both students and campus operations." *Id.* at 5-6.

In short, the 2023 DCL fundamentally alters the entire higher-education landscape. It will "[d]rive away providers," "derail study abroad programs," "block pathways for international students," "[j]eopardize and thus decrease recruitment pathways," and "[o]ver burden institutions of higher education and their vendors." Dameron Ex. 16 (Univ. of Dayton Comment) at 2-5.[4]

---

[4]   All of this disruption only scratches the surface, as many other comment letters make clear. *See, e.g.*, Dameron Exs. 35-37 (comment letters from Education Testing Service, Diversity Abroad, and the National College Attainment Network). The rest of the comments are available at https://www.regulations.gov/docket/ED-2022-OPE-0103/comments.

The palpable sense of surprise and alarm among institutions of higher education and their partners, as reflected in the public comments submitted to the Department, confirms that the Department has strayed far from its proper authority in this case.  Those comments clearly evidence the catastrophic effects threatened by regulatory action that is patently unlawful, contrary to longstanding agency practice, and entirely uninformed by the usual processes of advance notice and comment that are supposed to govern such action.  This Court should block the Department from mandating compliance with the 2023 DCL before it inflicts any further harm on the Nation's colleges and universities and their students.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a stay of the 2023 DCL's effective date and a preliminary injunction barring the Department from enforcing the 2023 DCL as to Plaintiffs.

Dated: April 7, 2023

Respectfully submitted,

/s/  *Roman Martinez*
Roman Martinez (DC Bar No. 1001100)
Andrew D. Prins (DC Bar No. 998490)
Charles S. Dameron (DC Bar No. 1048053)
William J. Seidleck (DC Bar No. 1602107)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: roman.martinez@lw.com

*Attorneys for Plaintiffs*