**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2U, INC., and GET EDUCATED INTERNATIONAL PROPRIETARY LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>MIGUEL CARDONA, Secretary of Education, and U.S. DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 1:23-cv-00925-TNM<br>**REDACTED** |

**DECLARATION OF BRADFORD R. ADAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY PENDING REVIEW AND PRELIMINARY INJUNCTION**

I, Bradford R. Adams, declare as follows:

1. I am Chief University Operations Officer at 2U, Inc. ("2U"). I have worked at 2U since 2009.

2. As Chief University Operations Officer, I am responsible for overseeing 2U's service delivery to its university partners, and I manage a broad array of university operations functions, including admissions, student support, faculty support, tech support, placement, and career and workforce functions.

3. I have personal knowledge of the matters in this declaration and would testify truthfully to them if called upon to do so.

**Background**

4. 2U was founded on the belief that expanding access to the world's great non-profit universities through online education can change lives and meet the critical needs of our society. Today, in the face of an acute shortage of skilled labor in America, organizations like 2U play a vital role in helping non-profit universities meet the growing need for career-relevant education at

scale. For more than 15 years, 2U has partnered with nonprofit colleges and universities to build, deliver, and support thousands of high-quality online programs, giving millions of people access to high-quality higher education without having to quit their jobs or uproot their lives. In all, tens of millions of learners have registered with 2U to access these programs, ranging from free courses to full degrees, offered in partnership with hundreds of public and non-profit colleges and universities, including 22 of the top 25 universities ranked as "Best Global Universities" by *U.S. News & World Report*.

5. Universities partner with 2U because of its dedicated focus on quality and student outcomes. From large public institutions to small private universities, hundreds of institutions rely on 2U's unique bundle of technology, data, support services, investment capital, and people to help develop, deliver, and support online education programs that meet the same high standards as their on-campus programs. The development of high-quality online courses is capital-intensive and time-intensive, and requires special technological and online curriculum-development expertise that many institutions (particularly smaller institutions) lack. 2U is able to deploy its capital and technological expertise to more efficiently build, deliver, and support digital education at scale. By partnering with 2U, universities can provide their own high-quality instruction to a broader set of students without taking on the cost and risk of developing the infrastructure for an online program from scratch.

6. More than half of the degree programs 2U supports are in disciplines that require state occupational licensure, such as public health, healthcare, and education. Frequently, state licensing authorities require students to spend a certain amount of time in practical "field placements" as part of their degree curriculum before ultimately qualifying for a license to practice their occupation. 2U plays a pivotal role in ensuring that students who are studying in its partners'

online programs to become nurses, midwives, social workers, teachers, physician assistants, and speech pathologists find placement sites to complete their clinical requirements in their local communities. For students from rural areas, finding a placement site can sometimes be particularly challenging. 2U is able to leverage its nationwide network of clinics, hospitals, schools, and other sites to secure local placements for these students, an effort that would be difficult for universities to replicate independently. To date, 2U has matched students with over 26.5 million hours of virtual and in-person field placements in all 50 states and the District of Columbia.

7. To date, 2U has supported institutions in the development of 180 state-of-the-art online degree programs that span 29 career-relevant fields like nursing, education, social work, artificial intelligence, business, and data science.

8. Students enrolled in 2U's partner programs frequently outperform their campus-based counterparts in the areas of retention and graduation rates. According to the 2019 *Gallup-2U Graduate Outcomes Benchmark Report*, 92% of surveyed alumni from 2U-powered graduate degree programs would still pursue an online graduate degree if they had to do it over again. 2U also publishes a *Transparency Report* with self-reported data on our partnerships. As described in the 2021 *Transparency Report*, 2U degree programs have a 90% retention rate and a 73% graduation rate. A true and correct copy of the 2019 *Gallup-2U Graduate Outcomes Benchmark Report* is attached as **Exhibit 1**. A true and correct copy of the 2021 *Transparency Report* is attached as **Exhibit 2**.

9. 2U provides its partner institutions with a variety of services, including learning technology, learning design, career support, marketing services, student engagement and support, technology, enrollment application assistance, student recruitment, placement services, and other support services necessary for the online delivery of university programs. University oversight

and autonomy are central to each of 2U's partnerships. Institutions maintain full control over tuition pricing, accreditation, curriculum, admissions standards and acceptance decisions, graduation requirements, faculty hiring decisions, student instruction, program size, and financial-aid decisions and administration. Institutions also approve all marketing assets and collateral.

10. In exchange for the bundle of services 2U provides to its university partners for online programming, 2U receives a share of the tuition revenue received by those institutions for those programs, consistent with Department of Education regulations and guidance.

11. 2U's partnerships with educational institutions with respect to degree programs are memorialized in long-term (typically greater than ten years) Master Services Agreements, which establish flexible frameworks for successful, long-term partnerships. These contracts set forth each party's rights and responsibilities and the terms and conditions with respect to the educational program(s) that 2U supports for each institution. For example, the contracts specify: (i) the services that 2U will provide; (ii) the university's obligations with respect to the educational program (e.g., create the program curriculum, determine admissions standards, make admissions decisions, provide faculty, confer degrees, etc.); (iii) the percentage of tuition revenue that the university will pay 2U for its services; (iv) the length of the contract term, the parties' termination rights, and the effect of termination; and (v) the parties' intellectual property rights, including applicable licenses to use the other party's intellectual property in connection with the educational program. The contracts also include detailed risk allocation provisions, including indemnification, limitation on direct damages, and disclaimers of indirect damages.

12. With respect to its institutional partners' degree programs, 2U makes significant up-front investments in technology development, curriculum development, and marketing services (oftentimes up to $5 million each), and recoups those investments over time through revenue

sharing arrangements with partner institutions. As a result, these contracts generally: (i) do not contain termination-for-convenience provisions; (ii) are terminable for breach only if the breach is not cured within a significant period of time; and (iii) contain transition provisions detailing how students are to be taught through the remainder of the program and how the program will be transitioned in an orderly fashion in the event of the termination or expiration of the contract, with the intent of ensuring that the student experience is not adversely impacted by the end of the contractual relationship and that 2U is compensated for all services provided.

13. 2U's contracts with its university partners are complex and long-term. Negotiations are oftentimes protracted (often taking many months, if not years) and involve multiple internal and external stakeholders for each party (for example, financial representatives, legal representatives, university operations, university faculty, university leadership, technology support, and cybersecurity personnel).

14. Under the Higher Education Act and the U.S. Department of Education's longstanding regulations and regulatory guidance, 2U has never previously been classified as a third-party servicer. In fact, 2U has deliberately structured its business so as *not* to act as a third-party servicer within the meaning of the Higher Education Act. In response to earlier guidance from the Department in a 2015 Dear Colleague Letter, in which the Department articulated that "providing financial aid counseling" constituted a third-party servicer activity, 2U expressly instructed its admissions counselors not to discuss financial-aid options with prospective students even if asked, and instead simply to refer such prospective students to the university's financial-aid webpage if financial-aid questions are raised by a prospective student.

15. Indeed, 2U's existing agreements with its institutional partners are expressly premised on the view that 2U is not a third-party servicer. For example, 2U's standard contracts

contain the following language: "University shall be solely responsible for the administration of all financial aid programs and will process all requests for aid within ten (10) days for 90% of Program Applicants," and "2U shall not be involved in any manner in the award or disbursement of financial assistance provided pursuant to Title IV of the Higher Education Act of 1965, as amended. University acknowledges that 2U is not, and shall not be reported by University as, a "third party servicer" (as defined by federal regulations including 34 C.F.R. §§ 668.2 and 668.25)."

16. The statutory and regulatory regime governing third-party servicers imposes significant costs, obligations, and risks on such entities. Among other things, third-party servicers are subject to an annual audit requirement, 20 U.S.C. § 1094(c)(1)(C)(i), extensive reporting obligations, 34 C.F.R. § 668.25(c)(2), joint and several liability with each partner institution for its violation of Title IV regulations, *id.* § 668.25(c)(3), and the risk of being barred by the Department from contracting with all institutions for a five-year period for violations of regulatory requirements, *see id.* § 668.25(d)(1). The regulations also impose fiduciary obligations on third-party servicers, requiring them to fulfill their duties subject to the highest standard of care and diligence. 34 C.F.R. § 668.82.

**The Department's Issuance Of The 2023 DCL**

17. On February 15, 2023, the Department released updated third-party servicer guidance in Dear Colleague Letter GEN-23-03 ("2023 DCL"). That guidance revoked all prior third-party servicer guidance upon which 2U relied in developing its business model and negotiating its master services agreements with its partner institutions.

18. The original version of the 2023 DCL purported to take effect immediately, and directed every entity newly deemed to be a third-party servicer to come into compliance with the Department's third-party-servicer regulatory regime by May 1, 2023. On February 28, 2023, the

Department postponed the DCL's effective date—and date for mandatory compliance—to September 1, 2023.

19. The 2023 DCL significantly broadens the definition of a third-party servicer. It redefines the term "third-party servicer" by applying that label to a variety of new functions, and contains a catch-all provision which brings in any party who performs "functions or services necessary to perform any other aspect of the administration of the Title IV programs or comply with the statutory and regulatory requirements associated with these programs."

20. The 2023 DCL's broad language sweeps in 2U as a third-party servicer, subjecting 2U to an extensive set of regulatory third-party servicer requirements set forth in the Higher Education Act itself, the Department's implementing regulations, and additional guidance documents. As explained more fully below, complying with the new requirements imposed by the 2023 DCL will be tremendously disruptive to 2U's business, and will transform the relationships between 2U, its partner institutions, and the Department. Ultimately, that disruption will harm students currently enrolled in our partners' programs and will reduce access to high-quality education for future students who could benefit from online programs that would advance their careers. And the 2023 DCL will require 2U to undertake significant alterations to its business well before September 1, 2023.

**Contractual Renegotiations**

21. As explained below, 2U's newfound designation as a third-party servicer under the 2023 DCL requires significant revision and renegotiation of each and every one of 2U's long-term contracts with its partner institutions for 180 degree-granting programs at colleges and universities around the country, collectively contributing over $571.6 million in revenue for 2U in 2022.

22. The 2023 DCL expressly requires the inclusion of several new provisions in 2U's contracts with its partner institutions. As a third-party servicer, 2U must now agree in its contracts with partner institutions: (i) to be jointly and severally liable with the institution to the Department for any violation of Title IV requirements resulting from the functions performed by 2U (even if 2U was not primarily responsible for the Title IV violation); (ii) to comply with all statutory, regulatory, and other Title IV requirements—including requirements concerning compliance audits; (iii) to refer any suspicion of fraudulent or criminal conduct to the Department; (iv) to return all records or unexpended Title IV funds to the institutions if the contract is terminated or if 2U fails to perform any functions prescribed under the contract for any reason; and (v) to comply with all aspects of the Family Educational Rights and Privacy Act. The 2023 DCL also strongly encourages institutions to include contractual provisions allowing any third-party servicer contract to terminate immediately and without penalty if the Department takes certain disciplinary actions against 2U.

23. [redacted]

24. [redacted]

25. Beyond these formal legal requirements, 2U will also be forced—as a practical business necessity—to seek other changes to its existing agreements to reflect the dramatic expansion of the risks 2U will face in partnering with any particular institution under the 2023 DCL. [redacted]

*Marketing and Recruiting Services*

26. As part of its bundle of services, 2U provides marketing and recruiting services for its university clients. Recruiting services include (i) corresponding with prospective students who

have requested to hear more information about a particular program; and (ii) supporting prospective students through the process of applying to the program(s) in which they are interested. Marketing services include search engine optimization, paid search, social media marketing and custom website development and deployment. Marketing services necessarily require 2U to make statements about the universities and their programs.

27. The HEA prohibits a Title IV institution—as well as a person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services—from engaging in a "substantial misrepresentation" regarding: (i) the nature of the school's education programs; (ii) the school's financial charges; or (iii) the employability of the school's graduates. *See* 34 C.F.R. §§ 668.71–74. 2U's university clients approve and/or provide the marketing materials that 2U uses to market its clients' programs and 2U does not knowingly utilize false or misleading marketing materials. However, in some circumstances, partner institutions may provide 2U with approved marketing materials that the Department could consider to include substantial misrepresentations under the broad definition noted above. Under the 2023 DCL, if the Department determines that one of 2U's institutional partners has made substantial misrepresentations with respect to a program operated by 2U, the Department could try to hold 2U jointly and severally liable for the Title IV liabilities related to such misrepresentations, whether through its "borrower defense to repayment" regulations or otherwise. 2U could also be exposed to increased risk of action under the federal False Claims Act related to material misrepresentations. Prior to the 2023 DCL, although 2U was still directly subject to liability for its own misrepresentations, 2U did not face joint and several liability to the Department for representations made by its partner institutions that caused harm in connection with functions performed by 2U.

28. To take one example, 2U was recently sued alongside the University of Southern California by a putative class of plaintiffs regarding marketing materials that included *U.S. News & World Report* rankings that USC allegedly obtained by misrepresenting data about certain programs. As it relates to 2U, this suit is completely without merit. 2U played no role in USC's submission of data to *U.S. News & World Report* and was not aware that any rankings used in its materials were false or misleading. And on March 8, 2023, 2U filed a motion to dismiss the litigation on that and other bases.[1] As indicated in 2U's motion to dismiss, USC's internal investigation conducted by independent counsel, Jones Day, assigned full responsibility for this course of conduct to USC: "The ultimate decision-making authority and responsibility for the School's survey submissions rested with the School's dean, who reviewed and approved the submissions before they were transmitted to US News."[2] The Jones Day Report did not mention 2U at all, as this activity had absolutely nothing to do with 2U. However, under the 2023 DCL, regardless of the outcome of the class action lawsuit, the Department could unilaterally determine that 2U has participated in substantial misrepresentations by using information provided by USC to 2U that USC knew or should have known to be false to market USC's programs, and it could try to hold 2U jointly and severally liable for the Title IV liabilities related to such alleged misrepresentations.

---

[1] *See* Motion to Dismiss, *Favell et al v. University of Southern California et al,* No. 2:23-cv-00846-SPG-MAR, (C.D. Cal. Mar. 8, 2023), ECF 28.

[2] Jones Day, School of Education Rankings Data Reporting Investigation (Apr. 27, 2022) https://customsitesmedia.usc.edu/wp-content/uploads/sites/545/2022/04/29110617/Rossier-Rankings-Report-4.27.22.pdf

*State Authorization and Licensure Services*

29. As part of its bundle of services, 2U provides university clients with assistance in securing program-specific state authorization approvals as may be necessary to operate a particular program.

30. The Department's regulations mandate that institutions must satisfy applicable state-law requirements pertaining to the enrollment of students in distance-learning programs in any state in which the institution is not physically located or in which the institution is otherwise subject to the state's jurisdiction, or participate in a state reciprocity agreement that covers the institution's activities in that state. Satisfaction of such requirements is a condition of Title IV eligibility. *See* 34 C.F.R. § 600.9. And failure to comply may result in the institution being required to return all Title IV funds received for programs that are not properly authorized. To the extent that a failure to obtain state authorization was due to the fault of the university, the 2023 DCL saddles 2U with joint and several liability for that failure.

31. [redacted]

32. [redacted]

33. [redacted]

*Indemnification; Limitation of Liability; Representations and Warranties*

34. [redacted]

35. [redacted]

*Termination*

36. As mentioned above, the 2023 DCL strongly encourages institutions to include contractual provisions allowing any third-party servicer contract to terminate immediately and without penalty if the Department takes certain disciplinary actions against 2U. [redacted]

[redacted]

37. 2U's negotiations with each of its partner institutions are not guaranteed to succeed and will cause significant disruption to its business. In 2U's experience, contract renegotiations can take many months, and require significant internal resources throughout the negotiation process. [redacted]

38. Furthermore, once 2U renegotiates its contracts, it will be difficult—and perhaps impossible—to restore the *status quo ante* if the 2023 DCL is found to be unlawful. At a minimum, doing so would yet another round of contract renegotiation, at great burden and expense to 2U.

**New Compliance Obligations**

39. In addition, the 2023 DCL will directly subject 2U to other substantial and burdensome compliance obligations.

40. Having been reclassified as a third-party servicer, 2U will be required to undergo an annual compliance audit of its administration of the functions and services that it performs under its contracts with eligible Title IV institutions pursuant to 20 U.S.C. § 1094(c)(1)(c)(i) and 34 C.F.R. § 668.23(a)(3). Department regulations provide that the audit must follow the procedures contained in an audit guide developed by the Department's Office of Inspector General

("OIG"), 34 C.F.R. § 668.23(a)(3), and be submitted to the Department no later than six months after the last day of the servicer's fiscal year. *Id*. § 668.23(c)(3). The recently released 2023 OIG Audit Guide, effective for fiscal years beginning on or after January 1, 2023,[3] does not address the import or consequences of the Department's new expanded definition of a third-party servicer; instead, it continues to provide audit procedures only for servicers who assist with the administration of Title IV funds. Significantly, the 2023 DCL further requires a letter of assurance from the management of third-party servicers, as part of their compliance audit submission, of each of the following: (i) that each of their 180 contracts contain the mandatory contractual requirements, including joint and several liability; (ii) that the servicer has established a system of internal controls to ensure compliance with applicable laws and regulations; (iii) that the servicer "maintains comprehensive written procedures describing the functions or services it performs on behalf of institutions"; (iv) that the servicer complies with all requirements of FERPA and the information security requirements of the FTC regarding safeguarding educational records and student information to which it has access; and (v) that the servicer adheres to all Department requirements for accessing and/or granting access to the Department's systems. 2U, whose fiscal year ends December 31, 2023, would be required to meet all of these requirements under all of its contracts by September 1, 2023. Discussions with Title IV compliance auditors, who look to the OIG Audit Guide to determine the scope of and procedures for their audits, reveal that they are unable to provide an estimate of the cost of a compliance audit for a company such as 2U without further guidance from the Department as to how these audits are to proceed.

[3] U.S. Dep't of Educ., Office of Inspector General, *Guide for Financial Statement Audits of Proprietary Schools and for Compliance Attestation Examination Engagements of Proprietary Schools and Third Party Servicers Administering Title IV Programs,* Mar. 2023 ("**2023 Audit Guide**"), https://www2.ed.gov/about/offices/list/oig/nonfed/2023auditguide.pdf.

41. I understand that, under the terms of the 2023 DCL, as a third-party servicer, 2U will be required to implement and maintain certain "safeguards for customer information" as provided for in the information security requirements for financial institutions established by the Federal Trade Commission (FTC) under the Gramm-Leach-Bliley Act. As 2U is not a financial institution, 2U is not currently subject to such requirements.

42. The 2023 DCL also expressly requires 2U to refer any suspicion of fraudulent or criminal conduct regarding administration of the institution's Title IV programs to the Department.

43. 2U's classification as a third-party servicer will also mean that its contracts with its partner institutions will be subject to inspection and review by the Department at any time. 20 U.S.C. § 1099c(b)(3)(A).

44. Compliance costs arising from these requirements will be nonrecoverable if the 2023 DCL is found to be unlawful.

45. Furthermore, the breadth and ambiguity of the 2023 DCL leaves many crucial compliance questions unanswered and subject to considerable doubt, which will in itself drive up compliance costs as 2U endeavors to ascertain its duties and obligations under the new legal regime announced by the Department. For example, it remains unclear what audit standards will apply with respect to the various services delivered by 2U to its partner institutions, and how the Department might assess third-party servicer liability in connection with those services.

**Foreign Subsidiaries and Subcontractors**

46. In 2017, 2U purchased a South African company, Get Educated International Proprietary Ltd., that provided online program management services to leading universities in the United States (including Harvard University and MIT), the United Kingdom (including the University of Cambridge), and South Africa. 2U paid $103 million for Get Educated in order to

solidify its position as a global leader in digital education. The acquisition also gave 2U access to Get Educated's talented workforce of digital education specialists in Cape Town, South Africa. [redacted]

47. Get Educated remains a South African proprietary company headquartered in Cape Town, but now operates as a wholly owned subsidiary and subcontractor of 2U. 2U has entered into numerous subcontracting arrangements with Get Educated to provide marketing and course-content development services for several degree-granting programs in the United States.

48. Under the 2023 DCL, institutions participating in Title IV financial-aid programs may not contract with an entity designated as a third-party servicer if that "servicer (or its subcontractors) is located outside of the United States." Thus, under the plain terms of the 2023 DCL, 2U's institutional partners may not contract with 2U so long as one of its "subcontractors," Get Educated, is located outside of the United States.

49. In order to bring itself into compliance with the 2023 DCL, 2U will have to sever its subcontracting arrangements with Get Educated, and either devise other subcontracting relationships with U.S.-based entities, or else hire additional U.S. personnel to perform the marketing work and course-content development work that is currently performed by Get Educated's employees in Cape Town. [redacted]

50. 2U would also have to sever relationships with any subcontractor who currently performs any covered services abroad. [redacted]

[redacted]

**<u>2U's Response to the 2023 DCL</u>**

51. On February 15, 2023—the day that the Department issued the 2023 DCL—2U initiated a legal and compliance review to determine the meaning of the Department's new guidance, whether such guidance would create any new applicable regulatory requirements for 2U, what steps 2U would need to take to comply with those regulatory requirements, and the anticipated expense of doing so. Beyond the problems described above, 2U has found that the 2023 DCL is written so broadly and ambiguously that it leaves many crucial compliance questions unanswered. For this reason, 2U submitted extensive comments to the Department seeking clarification as to several open questions regarding the Department's enforcement plans. Notwithstanding the uncertainty created by the 2023 DCL, however, it has become clear that the burdens of bringing 2U into compliance will be significant. Specific costs include the costs associated with renegotiating contracts and added liability insurance surrounding key functions, to name a few. These costs are further exacerbated by the condensed timeline for compliance by the September 1, 2023 effective date.

52. While 2U will continue taking all appropriate steps to prepare for implementation of the Department's guidance, I have found that many of the further steps required to comply with the Department's guidance (such as renegotiation of 2U's contracts with its partner institutions) would—if undertaken—cause a significant harm to 2U's business. Each of these steps would be

difficult or impossible to unwind and would thus require 2U to make irreversible changes to its business. 2U has accordingly decided to seek immediate relief to stay and enjoin the enforcement policy reflected in the 2023 DCL.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 7th day of April 2023,

Bradford R. Adams
Chief University Operations Officer
2U, Inc.